**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

James Mammone,                                        Case No. 5:16CV900

          Petitioner

     v.                                                        **ORDER**

Charlotte Jenkins, Warden,

          Respondent

This is a capital habeas case under 28 U.S.C. § 2254.

In 2010, a jury sitting in the Common Pleas Court of Stark County, Ohio convicted the petitioner, James Mammone, of murdering his two children and his former mother-in-law. The same jury recommended that Mammone be put to death, and the trial court imposed a death sentence. The Ohio Supreme Court affirmed the convictions and sentence on direct appeal, *State v. Mammone*, 139 Ohio St. 3d 467 (2014), and the Ohio courts rejected Mammone's collateral attack, *State v. Mammone*, 2012 WL 3200685 (Ohio App. 2012).

Pending is Mammone's amended petition for a writ of habeas corpus, which raises nineteen grounds for relief. (Doc. 23). For the following reasons, I deny the petition.

## Background

In June, 2009, the Stark County grand jury indicted Mammone on three counts of aggravated murder, two counts of aggravated battery, and one count each of violating a protection order and attempted arson.

Each aggravated-murder charge carried two death-penalty specifications that, if proved, would make Mammone eligible for a death sentence.

Count one, which charged Mammone with killing his mother-in-law Margaret Eakin, carried a course-of-conduct specification and a specification that Mammone had killed Margaret in the course of an aggravated burglary. Counts three and four, which charged Mammone with killing his daughter Macy (age five) and son James IV (age three), contained course-of-conduct and child-murder specifications.

Mammone pleaded not guilty and went to trial in January, 2010.

### A. Trial

According to the Ohio Supreme Court, whose factual determinations are presumptively correct on habeas review, *see* 28 U.S.C. § 2254(e)(1), the prosecution:

> called Mammone's ex-wife, Marcia Eakin, to testify. Marcia testified about the breakdown of her relationship with Mammone and stated that she first told Mammone in August 2007 that she intended to leave him. On that day, Mammone stayed home from work and refused to let her or their two children, Macy and James IV, leave the family's Canton residence. Mammone broke Marcia's cell phone and took all the house phones. She did not leave him that day.
>
> {¶ 6} Marcia and Mammone sought counseling, but she did not feel that the marital relationship improved. She testified that Mammone threatened her, warning that "if I tried to leave he would kill me and the children." Unbeknownst to Mammone, Marcia contacted a lawyer to initiate the process of filing for divorce.
>
> {¶ 7} On June 13, 2008, Mammone learned that Marcia was seeking a divorce when he intercepted a call from Marcia's lawyer. According to Marcia, Mammone again threatened to kill her, declaring: "I told you if you tried to leave me I was going to kill you." He told Macy and James on that date that "it was time for mommy to go to her grave." Mammone did not let Marcia or the children out of his sight for the rest of the day.
>
> {¶ 8} Marcia explained that she and the children managed to get away from Mammone, and she sought a civil protection order against him. On July 10, 2008, the Stark County Common Pleas Court issued a two-year protection order

requiring Mammone to stay more than 500 feet away from Marcia. He was permitted only supervised contact with the children.

{¶ 9}  Marcia testified that the Mammones' divorce was finalized in April 2009. Under the final divorce decree, Mammone was permitted overnight visitation with the children four times a month and evening visitation twice a week. Marcia explained that Mammone picked up and dropped off the children at the home of her parents, Margaret and Jim Eakin, so that Mammone would not have direct contact with Marcia or know where she lived. During visits, Mammone was permitted to text Marcia about matters pertaining to the children.

{¶ 10}  Marcia testified that on Sunday, June 7, 2009, Mammone picked up five-year-old Macy and three-year-old James at the Eakins' home for a scheduled overnight visit. Mammone was driving his green BMW.

{¶ 11}  Marcia met a friend, Ben Carter, to play tennis and have dinner. At 4:25 p.m., Mammone began to text Marcia. Although the two never spoke that night, they exchanged dozens of text messages over the next 15 hours, and records of these messages were introduced at trial.

{¶ 12}  At first, Mammone sought advice about consoling Macy, who was upset. But he quickly shifted to blaming Marcia for the children's suffering, texting: "How long are we going to let these children that you * * * had to have suffer?" Throughout the evening Mammone repeatedly texted Marcia, accusing her of "ruin[ing] lives" by putting herself first. He admonished her to put her children first and demanded to know what was more important than the kids at that moment. Marcia replied by texting that Mammone should "stop tormenting" the children. No fewer than five times, she offered to have Mammone return the children to her mother's house or asked if she could meet him to pick up the children.

{¶ 13}  Mammone advised Marcia in a text that he was "at [the] point of no return" and that he "refuse[d] to let gov restrict my right as a man to fight for the family you promised me." At 9:11 p.m., he warned Marcia that "safe and good do not apply to this night my love." Marcia promptly responded, texting: "Do not hurt them." At 9:35 p.m., she asked him to "[k]eep them safe." Mammone texted:

> You got five minutes to call me back on the phone. I am not fucking around. I have stashed a bunch of pain killers for this nigh[t] * * * i hope u would never let happen. I have put on my wedding band, my fav shirt and I am ready to die for my love tonight. I am high as a kite * * * bring o[n] the hail of bullets if need be.

{¶ 14}  At this point, Marcia called 9–1–1. The state played a recording of the call at trial. On the recording, Marcia advised the 9–1–1 operator that her children were in a car with her ex-husband, who had threatened to take "a bunch of

painkillers" and had said that he was "ready to die tonight." While Marcia was on the line with the 9–1–1 operator, the operator attempted to call Mammone, but he would not answer his phone. After speaking to the 9–1–1 operator, Marcia texted Mammone that she would not call him (in accordance with the operator's advice), and again urged him to "keep the kids safe." At 10:18 p.m., Marcia in a text to Mammone asked him to meet her so that she could pick up the kids. Marcia's friend Carter confirmed that he and Marcia then drove around looking for Mammone.

{¶ 15}  Marcia testified that she then contacted both Mammone's mother and the wife of Richard Hull, Mammone's friend and former employer. Phone records indicate that Richard Hull began to text Mammone, advising him to calm down and keep the kids safe. Hull's texts suggested that Mammone should drop the kids off with Mammone's mother. Hull testified that he and his father also drove around for a time looking for Mammone but did not find him.

{¶ 16}  At 2:00 a.m. on June 8, Mammone sent a text to Marcia, stating, "I am not one who accepts divorce. * * * I married you for love and for life * * *." At 2:36 a.m., he wrote, "I am so dead inside without u. The children r painful * * * [r]eminders of what I have lost of myself. This situation is beyond tolerable. So what happens next?" At 2:50 a.m., Mammone reiterated in a text to Marcia that the love of his children was "only a source of pain" without her love.

{¶ 17}  Hull testified that around 3:00 a.m., he spoke to Marcia and decided not to go back out looking for Mammone because they were hopeful that everything would be fine. Marcia attempted to end her text conversation with Mammone, writing, "Please[ ] keep kids safe good night."

{¶ 18}  At 5:34 a.m., Mammone texted Marcia: "Last chance. Here it goes."

{¶ 19}  One of the Eakins' neighbors, Edward Roth, testified that around 5:30 a.m., he heard gunshots and screaming through his open bedroom window. Roth said that he saw a goldish-tan-colored car leaving the Eakin residence and several minutes later saw the same car returning to the street to sit in the middle of the intersection near the house. Roth called 9–1–1. A law-enforcement officer testified that he and another officer arrived to find Margaret Eakin lying severely injured on the floor of a second-floor bedroom. The officers observed two shell casings and a broken lamp.

{¶ 20}  Marcia testified that she heard a car roar up her driveway around 5:40 a.m. From a second-floor bedroom window, she saw Mammone get out of the car and empty a red gasoline container onto Carter's truck, which was parked in the driveway. She called 9–1–1, and a recording of the call was introduced at trial by the state. While Marcia was on the phone, she "heard the glass in my back door breaking in and he was inside my apartment." She did not hear Mammone speak, but she heard something that he had thrown hit the ceiling. He then went back

outside and threw things at the windows. Mammone left before two deputy sheriffs arrived. According to the deputies, the back door had been forced open, the screen-door glass was broken, and pieces of the door frame were on the kitchen floor.

{¶ 21} The deputies quickly realized that the incident at Marcia's apartment was linked to the incident at the Eakins' residence, but law-enforcement officers had not yet located Mammone, and they did not know whether the children were safe.

{¶ 22} At 6:04 a.m., Mammone left a voice mail on Hull's phone, in which the jury heard Mammone confess to Hull, "I killed the kids." Mammone's voice mail continued:

> I said it when I got locked up fucking 358 days ago that she fucking has to die and unfortunately as fucking sick as it sounds I concluded after a while that she took my family from me and the fucking way to really get her is to take fucking her mom and her kids from her. I missed her dad by a couple minutes. I drove by the house, he was there, and I fucking circled the block and he must've just pulled out or I'd have fucking popped his fucking ass too.

{¶ 23} Sergeant Eric Risner testified that he and other officers apprehended Mammone sometime after 7:30 a.m. on June 8, 2009, in the driveway of his residence. They found Macy and James dead in the back seat of Mammone's car, still strapped into their car seats. The children had apparently been stabbed in the throat.

{¶ 24} Officer Randy Weirich testified that he removed two items from Mammone's car at the scene: a bloody knife from the back seat and a firearm from the front seat. The firearm had a live round in the chamber, its hammer was cocked, and the safety was off.

{¶ 25} After the vehicle was towed for processing, Officer Weirich cataloged the rest of the car's contents. The evidence log includes ammunition for a .32–caliber gun; a backpack containing knives, heavy-duty shears, and tongs; an axe handle with nails protruding from holes that had been drilled into it; a baseball bat; a military-style bayonet; Mammone's cell phone and a spare battery; a framed wedding photo of Marcia; and Marcia's dried wedding bouquet. Officer Weirich also removed from the car a switchblade and a pocket knife.

{¶ 26} Mammone was arrested and transported to police headquarters. Once in custody, he signed a written waiver of his *Miranda* rights and gave a full confession. The state introduced an audio recording of the confession at trial.

{¶ 27} In his confession, Mammone explained that he had picked up Macy and James for visitation at about 4:00 p.m. on June 7. He then drove past Marcia's

nearby apartment. (Mammone admitted that he was not supposed to know where Marcia lived, but he had learned her new address and occasionally stalked her.) He saw a truck parked in Marcia's driveway, and he recognized it because it had been parked there two weeks earlier. Macy told him that the truck belonged to a boy. Mammone explained that this news "didn't make me very happy obviously." He circled the block, and the truck was gone when he drove by again.

{¶ 28} Mammone stated that he suspected that Marcia was on a date, so he went "on the hunt" for her with the children in the back seat. He spent a few hours driving around looking for Marcia, all the while "sending [her] agitating text messages trying to get her attention."

{¶ 29} Around 6:30 p.m., Mammone took the children to his place for dinner. As he continued to text Marcia, he was "getting to the point of no return." He figured that he had already violated the protection order, and he had "had enough." He said that he had long hoped that things would improve, but stated that "once I suspected that she might have a guy that she was interested in that was it for me, I can't deal with that. It's just not anything that I'm willing to accept."

{¶ 30} According to Mammone, after dinner he loaded the children into a gold 1992 Oldsmobile that he had recently purchased. He stated that he had a Beretta .32–caliber automatic handgun, a gasoline container (which he later stopped to refill), a Scripto lighter, a bag full of butcher-type knives, a bayonet, a baseball bat, and another bat-type weapon he had made by driving nails through a hickory shovel handle or axe handle. He also said that he had approximately a dozen painkillers. He took one pill around 9:00 p.m. to "deaden the pain" if he was shot by police officers later that night.

{¶ 31} Mammone stated that he parked at Westminster Church (his and Marcia's "family church") just before 5:45 a.m. He stabbed Macy and James with a butcher knife while they were still strapped in their car seats. Mammone related that he had to stab each child in the throat four or five times, which was more than he had expected would be necessary. When detectives asked why he had stabbed the children rather than shooting them, Mammone offered three reasons: (1) noise, (2) uncertainty about whether his gun was dependable, and (3) a desire to conserve rounds for what might lie ahead.

{¶ 32} Mammone said that after killing Macy and James, he drove to the Eakins' home at approximately 5:45 a.m. He left the children in the back seat of the car and "barged in" through the Eakins' unlocked door carrying his Beretta. Mammone found Margaret in a guest room and shot her in the chest. The gun jammed before he could fire a second round, so he began to hit Margaret with the gun. He then beat her with a lamp until the lamp began to fall apart. Mammone managed to unjam the gun and shot Margaret in the face at close range. He told

police officers that a third bullet may have fallen out of the gun when he was attempting to dislodge the slide.

{¶ 33} Mammone stated that he then drove to Marcia's nearby apartment. The truck that he had seen the previous evening was in the driveway. He poured gasoline on the truck and attempted to light it, but the lighter fell apart in his hands.

{¶ 34} Mammone related that after he was unable to light the fire, he retrieved four weapons from his car: (1) the handgun, which he had to unjam again to prepare to fire, (2) the bayonet, which he put in his front pocket, (3) the baseball bat, and (4) the "bat type of weapon" that he had made. He smashed Marcia's screen-door window and back door with the bat and then entered the apartment. Once inside, Mammone unsuccessfully looked for matches or a lighter. He did not go upstairs because he was concerned that Marcia or "the person that was there to protect her" might have a firearm, and he did not want to be a "sitting duck." Mammone left the apartment and began throwing the baseball bat at a second-floor window, but he became frustrated. He searched his car for another lighter and, unable to find it, drove away.

{¶ 35} After killing his mother-in-law and breaking into Marcia's apartment, Mammone drove around with the children's bodies for several hours. He had expected that he would want to die after committing these violent acts, but he was surprised to find that he "didn't really feel * * * like dying." He also "didn't feel like getting arrested," so he drove in areas where he did not expect to see police officers and drove the speed limit. He claimed that he then took approximately a dozen pills—which he identified as Valium or painkillers—but not enough to cause an overdose.

{¶ 36} Mammone said that he then drove to the Independence Police Station to turn himself in, but he fell asleep in the station parking lot. When he woke, he contacted a relative who arranged for Mammone to turn himself in at a Canton park. En route to the park, Mammone decided to go by his apartment to switch to his BMW, with the idea of leaving the children in the Oldsmobile so that they would not be part of any scene at the park. But an unmarked police car was waiting for him, and he was apprehended.

{¶ 37} Mammone told officers that he had contemplated "doing this" for 22 months, but that he had initially intended to kill Marcia, not Macy and James. He said that he killed his mother-in-law because it was "a major blow to [Marcia] to not have her mother." He indicated that hurting Marcia was one of the motives for killing Macy and James as well, but he also cited his objection to divorce as a reason for their murders. Mammone said that he did not intend to kill Marcia on June 8, but that he did plan to maim her. He had wanted to beat Marcia's uterus area with his homemade weapon (making her unable to conceive children), to break her ankles with the baseball bat (something she feared that she had seen done in a movie), and to cut out her tongue (as punishment for not speaking to

him). Mammone also said that he would have killed the man at Marcia's apartment if he could have.

{¶ 38}  Dr. P.S. Murthy, the Stark County coroner, performed autopsies on Margaret, Macy, and James on June 9, 2009. He testified that he determined that the cause of death for all three victims was homicide.

{¶ 39}  According to Dr. Murthy, Margaret had suffered two fatal gunshot wounds and more than 20 blunt-impact injuries and lacerations, consistent with being struck by the butt of a gun and by a household lamp. One bullet had been fired into Margaret's left upper lip from a distance of about six to eight inches and was recovered from the occipital lobe of her brain. Another bullet pierced Margaret's right upper shoulder, perforated her right lung, and exited through her back.

{¶ 40}  Dr. Murthy testified that both children died as a result of stab wounds with exsanguination (massive blood loss). Macy had multiple stab wounds to the neck, while James had a single stab wound that went through his neck. Both children's lungs were filled with aspirated blood. Macy's right hand and right leg bore multiple defensive wounds, and James had a defensive wound on his right hand.

{¶ 41}  According to a laboratory analyst who testified, multiple bloodstains on Mammone's shirt at the time of his arrest had DNA profiles consistent with Margaret's DNA. In addition, a laboratory analyst identified Mammone's fingerprint on a lighter that officers retrieved from a flowerbed near Marcia's apartment.

{¶ 42}  Law-enforcement officers took bodily fluid samples from Mammone on the day of his arrest. According to a laboratory analyst, tests did not reveal any trace of opiates or acetaminophen in Mammone's blood.

{¶ 43}  Mammone did not present a case in defense during the trial phase. Before the trial began, defense counsel advised the court during a bench conference that as a matter of strategy, Mammone had "elected to, in effect, concede the trial phase in this matter," and Mammone himself informed the judge that he instead preferred to focus on the second phase of trial. During a brief opening statement, defense counsel candidly explained to the jury that Mammone did not "contest[ ] much of the evidence and/or facts with respect to this matter." Mammone's counsel repeated that statement during trial-phase closing arguments, emphasized Mammone's honesty in responding to police officers' questioning, and urged the jury to decide the case based on the law rather than on emotion.

On January 14, 2010, the jury returned guilty verdicts on all counts. After a sentencing hearing, the jury unanimously recommended a sentence of death for each of the three aggravated murders. The trial court accepted the

recommendation and imposed three death sentences in open court on January 22, 2010.

{ ¶ 45}  The trial court then sentenced Mammone for his noncapital convictions. The court merged Mammone's convictions for two of the gun specifications and also merged his convictions for violating a civil protection order and aggravated burglary of the Eakins' home. Mammone was sentenced to a total of 27 years of consecutive imprisonment for his noncapital offenses.

*Mammone*, *supra*, 139 Ohio St. 3d at 468–75.

## B. Direct Appeal

Mammone raised nine claims in his appeal to the Ohio Supreme Court:

1. The trial court's denial of his motion for a change of venue violated his right to a fair trial.

2. The trial court erred in refusing to dismiss two veniremembers who were biased in favor of the death penalty.

3. The trial court erred by admitting unduly prejudicial crime-scene and autopsy photographs.

4. Prosecutorial misconduct at the guilt and sentencing phases.

5. Trial counsel were ineffective at the guilt phase for not: A) conducting an adequate voir dire; B) objecting to the admission of the crime-scene and autopsy photographs; and C) objecting to the prosecutor's misconduct.

6. Trial counsel were ineffective at the penalty phase for: A) not properly interviewing the defense's mitigation witnesses and preparing them to testify; and B) allowing Mammone to make a five-hour, unsworn statement to the jury.

7. The death penalty constitutes cruel and unusual punishment.

8. The death penalty violates the U.S. Constitution and international law.

9. Mammone's death sentence was unreliable and inappropriate under O.R.C. § 2929.05(A).

The Ohio Supreme Court rejected these claims and affirmed Mammone's convictions and sentences. The United States Supreme Court denied Mammone's ensuing petition for a writ of certiorari. *Mammone v. Ohio*, 135 S. Ct. 959 (2015) (mem.).

## C. Application to Reopen

In October, 2014, Mammone applied to reopen his direct appeal under Ohio S. Ct. Prac. R. 11.06. The application alleged that appellate counsel had been ineffective for not arguing that:

1.　Trial counsel were ineffective for presenting Mammone's mitigation case under the wrong statutory mitigating factor.

2.　The prosecution: A) withheld evidence that, shortly after his arrest, Mammone's blood and urine samples tested positive for benzodiazepines; and B) presented false testimony that Mammone's blood and urine tested negative for any drugs.

3.　Trial counsel were ineffective for not conducting an adequate voir dire of Juror 430, an "automatic death penalty juror."

4.　Trial counsel were ineffective for not making and/or renewing motions and objections to preserve Mammone's appellate rights.

(Doc. 10–21, PageID 1943–53).

The Ohio Supreme Court denied the application. (*Id.*, PageID 2036).

## D. Postconviction Review

In May, 2011, while his direct appeal was pending, Mammone filed a petition for postconviction relief in the state trial court and a request for funds to obtain neuropsychological testing. (Doc. 10–22, PageID 2154, 2368). The petition raised ten grounds for relief:

1.　Trial counsel were ineffective for not obtaining a neuropsychologist to evaluate Mammone.

2.　Trial counsel were ineffective for not conducting an adequate voir dire to determine if the veniremembers were biased in favor of capital punishment.

3.　Mammone did not receive a fair trial because one of the jurors refused to follow the trial court's instruction that he consider all mitigating factors presented by the defense.

4.　Mammone did not receive a fair trial because the jurors prayed together before beginning their penalty-phase deliberations.

5.　The imposition of the death penalty was arbitrary and capricious.

6.      Trial counsel were ineffective for not arguing or presenting evidence that the death penalty is applied in arbitrary manner in Stark County, Ohio.

7.      Trial counsel were ineffective for not using certain documents to cross-examine the state's toxicology expert, who testified that Mammone did not have drugs in his system after his arrest.

8.      The prosecution suppressed favorable evidence showing that Mammone had benzodiazepines in his blood or urine.

9.      The prosecution knowingly presented false testimony that Mammone did not have drugs in his system.

10.     The cumulative effect of the errors alleged in the postconviction petition prejudiced Mammone's trial and sentencing hearing.

(*Id.*, PageID 2154–85).

The state trial court denied relief. (*Id.*, PageID 2419–39). It also denied the request to fund a neuropsychologist, explaining that Ohio law did not entitle Mammone to such funds and that Mammone's defense team had the assistance of a forensic psychologist at trial. (*Id.*, PageID 2419–20).

Mammone appealed, raising the same grounds for relief that he had raised in his postconviction petition. The Ohio Court of Appeals affirmed. *State v. Mammone*, 2012 WL 3200685 (Ohio App. 2012) (*Mammone II*). He then sought leave to raise those same claims in the Ohio Supreme Court, but the court declined to hear the case. *State v. Mammone*, 141 Ohio St. 3d 1454 (Ohio 2015).

### E. Federal Habeas Petition

Mammone timely filed his § 2254 petition in this court in February, 2017, raising nineteen grounds for relief:

1.      The trial court's denial of his motion for a change of venue violated his right to a fair trial.

2. The trial court erred by admitting unduly prejudicial photographs and physical evidence.

3. The admission of crime-scene and autopsy photographs of Mammone's children violated Mammone's right to a fair trial.

4. Two jurors were biased in favor of the death penalty.

5. Trial counsel were ineffective for not moving to exclude Juror 430 based on his bias in favor of the death penalty.

6. One of the jurors refused to follow the trial court's instruction that he consider all mitigating factors presented to the jury.

7. The jury violated Mammone's right to a fair trial by praying before its penalty-phase deliberations.

8. Executing Mammone, who has a severe mental illness, would be cruel and unusual punishment.

9. Trial counsel were ineffective for not obtaining a neuropsychologist to evaluate Mammone and conduct necessary testing.

10. The prosecution withheld favorable evidence showing that Mammone's blood and urine had tested positive for benzodiazepines.

11. The prosecution knowingly introduced false testimony regarding the alleged absence of drugs in Mammone's blood and urine.

12. The prosecution committed misconduct during the penalty phase by arguing non-statutory aggravating factors.

13. The Stark County prosecutor's uncontrolled discretion to seek the death penalty is unconstitutional.

14. Trial counsel were ineffective for:

   A. not introducing evidence that Mammone has Autism Spectrum Disorder;

   B. failing to conduct an adequate voir dire to ensure the jurors were not biased in favor of the death penalty;

   C. not properly preparing the defense's mitigation witnesses to testify;

   D. permitting Mammone to make a five-hour unsworn statement at the penalty phase; and

E.      failing to object to all instances of prosecutorial misconduct.

15.     Trial counsel were ineffective for not gathering and presenting statistical evidence showing that the Stark County prosecutor pursues capital sentences in an arbitrary and capricious way.

16.     Appellate counsel was ineffective for not arguing that:

A.      Trial counsel were ineffective for presenting Mammone's mitigation case under the wrong statutory mitigating factor.

B.      The prosecution withheld evidence that Mammone's blood and urine samples tested positive for benzodiazepines and presented false testimony that Mammone's blood and urine tested negative for any drugs.

C.      Trial counsel were ineffective for not conducting an adequate voir dire of Juror 430, who was an "automatic death penalty juror."

D.      Trial counsel were ineffective for not making and/or renewing motions and objections to preserve Mammone's appellate rights.

17.     Ohio's capital-sentencing regime is unconstitutional.

18.     The cumulative effect of the foregoing errors prejudiced Mammone and violated his right to a fair trial.

19.     Trial counsel were ineffective for not raising a defense of not guilty by reason of insanity.

(Doc. 23).

In December, 2017, Mammone moved for a stay so that he could return to the Ohio courts and litigate four claims that he described as "unexhausted." (Doc. 24). I denied the motion, concluding that the claims were procedurally defaulted, not unexhausted, because he "had the opportunity to develop them in state court, but did not[.]" *Mammone v. Jenkins*, 2018 WL 454432, *1 (N.D. Ohio 2018) (*Mammone III*) (internal quotation marks omitted).

**Discussion**

The habeas corpus statute "bars relitigation" of those claims a state court adjudicated on the merits, unless the "state court's decision was contrary to federal law then clearly established in the holdings of" the United States Supreme Court, "involved an unreasonable application of such law," or "was based on an unreasonable determination of the facts." *Harrington v. Richter*, 562 U.S. 86, 100 (2011); 28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law only if the court "applies a rule that contradicts the governing law set forth in [Supreme] Court cases" or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives" at a different result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

A state court's application of the governing legal rule is unreasonable only when the court "err[s] so transparently that no fairminded jurist could agree with the court's decision." *Bobby v. Dixon*, 565 U.S. 23, 24 (2011); *see also White v. Woodall*, 572 U.S. 415, 427 (2014) (habeas relief is available "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no fairminded disagreement on the question") (internal quotations omitted).

Review under § 2254(d) is "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

**A. Pretrial Publicity**

Mammone first claims that the "extensive pretrial publicity surrounding the deaths of his children and mother-in-law" denied him a fair trial. (Doc. 23, PageID 11178). He contends that, in light of the extensive and adverse nature of the publicity, the Ohio courts should have

presumed that he could not receive a fair trial in Stark County. Alternatively, he argues that the jurors were actually biased against him.

This claim revolves around the fact that the local newspaper, the *Canton Repository*, published a letter that Mammone wrote in jail and sent to the newspaper. According to Mammone, this letter "detail[ed] what happened in the case and why the murders were committed." (*Id.*, PageID 11179). The *Repository* published this letter, essentially Mammone's confession, on the front page of its August 25, 2009 print edition and on its website. (*Id.*).[1]

Mammone also maintains that "numerous blogs, television broadcasts, radio shows, online chat rooms, and newspaper articles" provided "extensive coverage" of the case." (*Id.*). He cites excerpts from the *Repository*'s online comments section, where various participants urged that "this man deserves no trial" and "execute, execute, execute." (*Id.*, PageID 11180).

Adding to the already prejudicial nature of the pretrial publicity, Mammone contends, was the "sensational" nature of the case – Mammone "stabbed" his children "when he had them for visitation" as part of "a bitter divorce[.]" (*Id.*, PageID 11178).

The Warden argues that this claim is procedurally defaulted in part and otherwise without merit. (Doc. 29, PageID 11383–89).

### 1. State Court's Decision

The Ohio Supreme Court rejected Mammone's claim on direct appeal.

It first held that Mammone's case was "not one of the extraordinary cases in which prejudice should be presumed based solely on the amount and nature of the pretrial publicity alone." *Mammone*, *supra*, 139 Ohio St. 3d at 480. The court then ruled that Mammone forfeited

---

[1] "Mammone's confession letter published in the *Repository* was not admitted into evidence at trial." *Mammone*, *supra*, 139 Ohio St. 3d at 479 n.1.

his claim that the pretrial publicity in fact biased the jurors, and that he had not shown plain error to excuse his forfeiture. *Id.* at 481–82.

As the state high court explained:

{¶ 48} Mammone filed a pretrial motion for a change of venue on October 1, 2009. As an appendix to the motion, Mammone attached copies of articles posted on the *Canton Repository*'s website, CantonRep.com, between June 9 and August 26, 2009, along with comments posted by online readers of the newspaper. He also attached copies of postings that appeared on other websites.

{¶ 49} The trial court held a venue hearing on November 12, 2009. During the hearing, Mammone submitted 11 exhibits, including coverage of his case from various radio, television, and print publications. The materials included a copy of a "confession letter" that had been published in the print version of the *Repository* on August 25, 2009, and posted on its website. The letter, written and sent by Mammone himself, began with the statement that it was mailed to the newspaper to "set the record straight regarding any questions and misconceptions" about the murders of Margaret, Macy, and James. Mammone argued at the hearing that in light of these materials, "an attempt to seat a jury would be likely futile," so that the court should presume prejudice and grant his change-of-venue motion.

{¶ 50} The state countered that it would be premature to change venue before conducting voir dire, and the trial court agreed. The court expressed concern about the *Repository*'s publication of Mammone's letter, but observed that "this case has not gotten nearly the type of publicity" that would require the court to grant the motion without even seeking "to review and do a voir dire of prospective jurors." Without a thorough voir dire, the court deemed it impossible to determine whether media exposure was "so pervasive that an impartial jury [would] be impossible to seat." As a result, the court denied Mammone's motion as premature but left the issue open for further consideration "during and after the Voir Dire."

{¶ 51} At the close of the venue hearing, the court advised Mammone, "I would expect you to refile at any time or reargue your motion for a change of venue." Mammone never did so.

{¶ 52} We decline to allow Mammone to benefit from the publicity he created by submitting his own confession to the *Repository*. We conclude that the trial court's denial of Mammone's motion for a change of venue did not violate his rights to due process and to a fair trial by an impartial jury.

*b. Right to a fair and impartial jury*

{¶ 53} "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722

(1961). In a capital case, jurors must be impartial as to both culpability and punishment. *Morgan v. Illinois*, 504 U.S. 719, 726–728 (1992). "[W]hen it appears that a fair and impartial trial cannot be held in the court in which the action is pending," Crim.R. 18(B) gives a trial court authority—sua sponte or upon a party's motion—to transfer venue to another jurisdiction. *See* R.C. 2901.12(K); *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 33. One common argument for a venue change is that pretrial publicity has impaired a jury's ability to be fair and impartial.

{¶ 54} The trial court has a "duty to protect" criminal defendants from "inherently prejudicial publicity" that renders a jury's deliberations unfair. *Sheppard v. Maxwell*, 384 U.S. 333, 363, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). However, "pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 554, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976).

{¶ 55} This court has repeatedly stated that "the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality" is "a careful and searching voir dire." *State v. Bayless*, 48 Ohio St.2d 73, 98, 357 N.E.2d 1035 (1976); *see State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 49 (listing cases). As a general rule, a trial court should therefore make "'a good faith effort * * * to impanel a jury before * * * grant[ing] a motion for change of venue.'" *State v. Warner*, 55 Ohio St.3d 31, 46, 564 N.E.2d 18 (1990), quoting *State v. Herring*, 21 Ohio App.3d 18, 486 N.E.2d 119 (9th Dist.1984), syllabus.

{¶ 56} That said, the United States Supreme Court has held that in certain rare cases, pretrial publicity is so damaging that prejudice must be conclusively presumed even without a showing of actual bias. *See, e.g., Sheppard; Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Irvin*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751. To prevail on a claim of presumed prejudice, however, a defendant must make "'a clear and manifest showing * * * that pretrial publicity was so pervasive and prejudicial that an attempt to seat a jury would be a vain act.'" *Warner* at 46, 564 N.E.2d 18, quoting *Herring* at syllabus; *see Herring* at 18, 486 N.E.2d 119 (citing judicial economy, convenience, and reducing taxpayer expense as reasons for a trial court to attempt to seat a jury prior to transferring venue to another location).

{¶ 57} We therefore must engage in a two-step analysis of venue in this case, determining first whether the jury was presumptively prejudiced against Mammone and, if not, whether Mammone has established actual juror prejudice. *See Skilling v. United States*, 561 U.S. 358, 381, 130 S.Ct. 2896, 2915, 177 L.Ed.2d 619 (2010); *Campbell v. Bradshaw*, 674 F.3d 578, 593–594 (6th Cir.2012).

*c. Prejudice should not be presumed in this case*

{¶ 58}  "A presumption of prejudice" because of adverse press coverage "attends only the extreme case." *Skilling* at 381, 130 S.Ct. at 2915; *see also Campbell* at 593, quoting *Foley v. Parker*, 488 F.3d 377, 387 (6th Cir.2007) (prejudice from pretrial publicity "'is rarely presumed'").

{¶ 59}  The doctrine of presumed prejudice "is the product of three Supreme Court decisions from the 1960's": *Rideau v. Louisiana*, *Estes v. Texas*, and *Sheppard v. Maxwell. Hayes v. Ayers*, 632 F.3d 500, 508 (9th Cir.2011). The United States Supreme Court most recently applied the doctrine in *Skilling v. United States*, in which the court analyzed four factors before rejecting a claim of presumed prejudice. Namely, the court considered (1) the size and characteristics of the community in which the crime occurred, (2) whether media coverage about the defendant contained "blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight," (3) whether the passage of time lessened media attention, and (4) whether the jury's conduct was inconsistent with a presumption of prejudice. *Id.* at 382–383, 130 S.Ct. at 2915–2916; *see United States v. Warren*, 989 F.Supp.2d 494 (E.D.La.2013). However, *Skilling* did not hold that these four factors are dispositive in every case or indicate that these are the only relevant factors in a presumed-prejudice analysis.

{¶ 60}  Here, we find that our analysis is best informed by comparing the facts of this case not to *Skilling*—in which prejudice was not presumed—but to the facts of the cases in which the United States Supreme Court has presumed prejudice. Two of these three cases, *Estes* and *Sheppard*, are not particularly instructive because they "involved media interference with courtroom proceedings *during* trial." (Emphasis sic.) *Skilling*, 561 U.S. at 382, 130 S.Ct. at 2915, 177 L.Ed.2d 619, fn. 14; see also *Hayes*, 632 F.3d at 508. In *Estes*, "extensive publicity before trial swelled into excessive exposure during preliminary court proceedings" as the media "overran the courtroom" and caused significant disruption. *Skilling* at 379–380, 130 S.Ct. at 2914. In *Sheppard*, "bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom." *Sheppard*, 384 U.S. at 355, 86 S.Ct. 1507, 16 L.Ed.2d 600. The United States Supreme Court in *Sheppard* "upset the [defendant's] murder conviction because a 'carnival atmosphere' [had] pervaded the trial." *Skilling* at 380, 130 S.Ct. at 2914, quoting *Sheppard* at 358, 86 S.Ct. 1507. There is no evidence of such interference here.

{¶ 61}  The third case, *Rideau*, is most relevant to our analysis because in that case, the United States Supreme Court presumed prejudice based solely on pretrial publicity. In *Rideau*, the parish sheriff's office had filmed an interrogation of the defendant, during which he confessed to bank robbery, kidnapping, and murder. 373 U.S. at 724, 83 S.Ct. 1417, 10 L.Ed.2d 663. A 20–minute recording of the confession was broadcast three times on television within weeks of Rideau's trial. *Id.* Audiences ranging from 20,000 to 53,000 people viewed the broadcasts, in a total population of approximately 150,000 people. *Id.* Under the circumstances, the United States Supreme Court concluded that "to the tens of

thousands of people who saw and heard" Rideau "personally confessing in detail to the crimes," the interrogation "in a very real sense was Rideau's trial—at which he pleaded guilty to murder." (Emphasis sic.) *Id.* at 726, 83 S.Ct. 1417. As a result, the court concluded that the defendant's subsequent trial amounted to a "hollow formality," and it conclusively presumed prejudice. *Id.* at 726–727, 83 S.Ct. 1417.

{¶ 62}  As in *Rideau*, the instant case involves the widespread dissemination of a suspect's supposed confession to crimes. Like the trial court, we believe that "the publication of the [confession] letter on the front page" of the *Repository* "is the thing that's most troublesome" about the pretrial publicity in this case. A "defendant's own confession [is] probably the most probative and damaging evidence that can be admitted against him." *Skilling* at 383, 130 S.Ct. at 2916, quoting *Parker v. Randolph*, 442 U.S. 62, 72, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979) (plurality opinion). That said, pretrial publicity about a confession—even one that is inadmissible at trial—"is not in itself sufficient to require a venue transfer." *United States v. Warren*, 989 F.Supp.2d at 501.

{¶ 63}  Several constitutionally significant factors distinguish the print publication of Mammone's confession from the repeated television broadcasts of Rideau's confession that aired in 1961. First, the manner of publication differed in a crucial way. As the United States Court of Appeals for the Sixth Circuit has explained, "[T]he controlling factor in the [*Rideau*] decision was the fact that the public *viewed* the confession in a televised format." (Emphasis sic.) *DeLisle v. Rivers*, 161 F.3d 370, 384 (6th Cir.1998) (en banc). "[A]ctually seeing and hearing the confession, as one would in a courtroom, would create a certainty of belief that would be difficult for the public to lay aside." *Id.* Here, the public did not view Mammone confessing.

{¶ 64}  Second, the circumstances of publication diverge from *Rideau* in significant ways. In *Rideau*, the defendant's televised confession aired just weeks before the trial began, and roughly one-third of the entire local population viewed the broadcast. Here, Mammone's confession letter was published a single time more than four months before his trial began. And Mammone failed to establish a level of exposure in Stark County similar to the exposure in Rideau. The trial court concluded that it was not futile to attempt to seat a jury given "the figures submitted by the *Repository*" about readership, "the population of Stark County," and the considerations that the county has three newspapers and that many county residents subscribe to a fourth newspaper published outside the county. Mammone never supplemented the record or attempted to reargue this point.

{¶ 65}  Third, unlike *Rideau*, in which the defendant played no role in the dissemination of his confession, here Mammone himself provided the confession letter to the *Repository*. He therefore is responsible for instigating the single most significant incident of pretrial publicity in his case, which more than anything

increased that publicity to a level that he claims should have required the trial court to grant his motion to change venue.

{¶ 66}  Finally, although Mammone claims that "[t]he venires were replete with potential jurors who had been extensively prejudiced by media accounts and had formed such strong opinions as to not be able or willing to change their minds," the voir dire transcript reveals otherwise. Prejudice should not be presumed.

{¶ 67}  The trial court was very conscious of pretrial publicity in Mammone's case. Each potential juror was asked to complete an extensive publicity questionnaire, and the court permitted thorough questioning about publicity issues during small-group voir dire. Dozens of potential jurors stated that they knew nothing about the case. The court instructed the potential jurors during voir dire to disregard all information from outside sources and sought assurances that every juror would set aside any preexisting opinions and be fair to both sides. The potential jurors were reminded that the media is not always accurate, and they were warned to avoid additional publicity. Most importantly, the trial court excused potential jurors who expressed an inability to set aside preexisting opinions.

{¶ 68}  Under these circumstances, we cannot conclude that extensive pretrial publicity rendered Mammone's trial a "hollow formality." *Compare Rideau*, 373 U.S. at 726, 83 S.Ct. 1417, 10 L.Ed.2d 663. As a result, we hold that this is not one of the extraordinary cases in which prejudice should be presumed based solely on the amount and nature of the pretrial publicity alone.

*d. Actual prejudice does not exist in this case*

{¶ 69}  Having concluded that prejudice should not be presumed here, we next analyze whether actual prejudice exists. Because Mammone did not raise this objection in the trial court or seek a change of venue at any point after the pretrial venue hearing, we review this claim for plain error. *See State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 61 (reviewing change-of-venue claim for plain error when defendant had waived the argument). We take notice of plain error "with the utmost caution, under exceptional circumstances and only to prevent a miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. To prevail, Mammone must show that an error occurred, that the error was plain, and that but for the error, the outcome of the trial clearly would have been otherwise. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).

{¶ 70}  Mammone levies several charges of actual bias due to pretrial publicity among members of both the jury pool and the seated jury and argues that the trial court should have ordered a change of venue. For the reasons below, we find no error in this regard, let alone plain error.

{¶ 71}  First, Mammone argues that he was denied a fair trial because almost every seated juror "had either read, heard, discussed or [seen] an account of the deaths of the Mammone children and their grandmother." But actual bias is not established simply by pointing out some degree of media exposure. *See, e.g., Trimble* at ¶ 63–64; *State v. Maurer*, 15 Ohio St.3d 239, 251, 473 N.E.2d 768 (1984). A juror will be considered unbiased "if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin*, 366 U.S. at 723, 81 S.Ct. 1639, 6 L.Ed.2d 751.

{¶ 72}  Second, Mammone objects that four specific seated jurors—juror Nos. 372, 438, 448, and 461—were biased against him. But juror Nos. 438 and 448 testified that they had not formed any opinions about the case before trial. Juror Nos. 372 and 461 admitted that they had formed some preliminary opinions, but they assured the judge that they could set these opinions aside and be fair.

{¶ 73}  The trial judge is "in the best position to judge each juror's demeanor and fairness" and thus to decide whether to credit a potential juror's assurance that he or she will set aside any prior knowledge and preconceived notions of guilt. *Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, at ¶ 64. One factor in determining whether a trial judge reasonably accepted such assurances is how many other potential jurors admitted a disqualifying prejudice:

> In a community where most veniremen will admit to a disqualifying prejudice, the reliability of the others' protestations [of impartiality] may be drawn into question; for it is then more probable that they are part of a community deeply hostile to the accused, and more likely that they may unwittingly have been influenced by it.

*Murphy v. Florida*, 421 U.S. 794, 803, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). Here, there is no evidence of such unwitting influence. For example, in the first small-group voir dire session of 12 potential jurors, only two admitted to a disqualifying prejudice based on pretrial publicity and were excused. Upon careful examination of the record, we defer to the trial court's reasonable conclusion that the four jurors now challenged could be fair and impartial jurors.

{¶ 74}  Finally, we are not persuaded by Mammone's vague claim that the entire jury was tainted because those jurors who had been exposed to extensive publicity shared "innumerable opinions about the case" with other jurors. As explained above, Mammone has not established that any of his jurors were actually biased by pretrial publicity. Moreover, he presents no evidence that any juror improperly influenced another juror by stating an inappropriate opinion. Under the circumstances, we reject Mammone's contention as meritless and unsupported by the record.

*Mammone*, *supra*, 139 Ohio St. 3d at 475–82.

## 2. Discussion

"Criminal defendants tried in state court have a Fourteenth Amendment right to a fair trial by a panel of impartial, unbiased jurors." *Lang v. Grundy*, 399 F. App'x 969, 972 (6th Cir. 2012). "A jury is presumed impartial, and the burden rests with the challenger to show otherwise." *Id.*

"It is well established," however, "that if prejudicial pretrial publicity jeopardizes a defendant's right to a fair trial by an impartial jury, the court should grant the defendant a change in venue." *Campbell v. Bradshaw*, 674 F.3d 578, 593 (6th Cir. 2012).

"Presumptive prejudice from pretrial publicity occurs where an inflammatory, circus-like atmosphere pervades both the courthouse and the surrounding community and is rarely presumed." *Id.* "To demonstrate actual prejudice, the publicity and the voir dire testimony must show that a fair trial was impossible." *Hand v. Houk*, 871 F.3d 390, 410 (6th Cir. 2017)

The Supreme Court has emphasized that its cases "cannot be made to stand for the proposition that juror exposure to . . . news accounts of the crime . . . alone presumptively deprives the defendant of due process." *Skilling v. U.S.*, 561 U.S. 358, 380 (2010). Thus "pretrial publicity – even pervasive, adverse publicity – does not inevitably lead to an unfair trial." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976).

The Ohio Supreme Court's decision in this case was not contrary to, nor did it involve an unreasonable application of, this clearly established Supreme Court precedent.

### a. Presumed Prejudice

### i. The "Contrary to" Prong

The state court recognized that "'[a] presumption of prejudice' because of adverse press coverage 'attends only the extreme case.'" *Mammone*, *supra*, 139 Ohio St. 3d at 477 (quoting

*Skilling*, *supra*, 561 U.S. at 381). But the court concluded that, for several reasons, the pretrial publicity in Mammone's case did not trigger that presumption.

Mammone contends that one of the state court's rationales – its refusal to "allow Mammone to benefit from the publicity he created by submitting his own confession to the *Repository*," *Mammone*, *supra*, 139 Ohio St. 3d at 476 – "contravenes" the Supreme Court's decision in *Rideau v. Louisiana*, 373 U.S. 723 (1963). (Doc. 34, PageID 11459).

The Court held in *Rideau*, *supra*, 373 U.S. at 725–26, that the repeated publication of a film in which the defendant confessed to murder created a presumption that the defendant could not receive a fair trial absent a change of venue. In so holding, the Court noted some uncertainty in the record as to "who originally initiated the idea of the televised interview" but concluded that this was an "irrelevant detail":

> The record fails to show whose idea it was to make the sound film, and broadcast it over the local television station, but we know from the conceded circumstances that the plan was carried out with the active cooperation of the local law enforcement officers. And certainly no one has suggested that it was Rideau's idea, or even that he was aware of what was going on when the sound film was being made.
>
> In the view we take of this case, the question of who originally initiated the idea of the televised interview is, in any event, a basically irrelevant detail. For we hold that it was a denial of due process of law to refuse the request for a change of venue, after the people of Calcasieu Parish had been exposed repeatedly and in depth to the spectacle of Rideau personally confessing in detail to the crimes with which he was later to be charged.

*Id.*

Contrary to Mammone's claim, nothing in this passage from *Rideau* clearly forbids a state court adjudicating a presumed-prejudice claim to give some weight to the fact that it was the defendant, rather than the authorities, who initiated the chain of events that allegedly warrant a presumption of prejudice. Indeed, the Court in *Rideau* emphasized that, unlike what happened

in Mammone's case, "no one has suggested that it was Rideau's idea, or even that he was aware of what was going on when the sound film was being made." *Id.* at 725. Here, of course, it was Mammone's idea to write a confession and send it to the local newspaper.

Because the Ohio Supreme Court was not dealing with "a set of facts that are materially indistinguishable from" *Rideau*, its decision was not contrary to that case or any other Supreme Court precedent. *Williams*, *supra*, 529 U.S. at 405.

### ii. The "Unreasonable Application" Prong

Nor did the Ohio Supreme Court unreasonably apply clearly established Supreme Court precedent in rejecting Mammone's presumed-prejudice claim.

The court began by comparing Mammone's case to two cases where the Supreme Court held that extensive pretrial publicity triggered a presumption of prejudice: *Estes v. Texas*, 381 U.S. 532 (1965), and *Sheppard v. Maxwell*, 384 U.S. 333 (1966). But those cases were "not particularly persuasive," the court found, because "they involved media interference with courtroom proceedings *during* trial," which was not an issue in Mammone's case. *Mammone*, *supra*, 139 Ohio St. 3d at 478 (emphasis in original).

Rather, the state court found that *Rideau*, *supra*, was the "most relevant" to its analysis because there the Supreme Court "presumed prejudice based solely on pretrial publicity." *Mammone*, *supra*, 139 Ohio St. 3d at 479.

Then, employing a totality-of-the-circumstances test that it derived from *Skilling*, *supra*, the Ohio Supreme Court identified "[s]everal constitutionally significant factors" that "distinguish[ed] the print publication of Mammone's confession from the repeated television broadcasts of Rideau's confession[.]" *Id.* These distinctions were: 1) the fact that Mammone's confession appeared once in print, whereas the confession in *Rideau* appeared on television three

times; 2) the *Repository* published Mammone's confession about four months before trial, whereas the confession in *Rideau* appeared "just weeks" before trial; 3) Mammone's "fail[ure] to establish a level of exposure in Stark County similar to the exposure in *Rideau*"; 4) Mammone was "responsible for instigating the single most significant incident of pretrial publicity"; and 5) the transcript of voir dire refuted Mammone's claim that "the venires were replete with potential jurors who had been extensively prejudiced by media accounts and had formed such strong opinions as to not be able or willing to change their minds." *Mammone*, *supra*, 139 Ohio St. 3d at 479–80.

Mammone responds that the state court's decision was unreasonable, first, because roughly fifty-six percent of the venire acknowledged that "they were exposed to media coverage of [his] alleged crimes." (Doc. 34, PageID 22457). In addition, eighty-one of those veniremembers "admitted to believing Mr. Mammone guilty based on media accounts." (*Id.*).

This contention lacks merit, given the Supreme Court's insistence that "[p]rominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require *ignorance*." *Skilling*, *supra*, 561 U.S. at 381 (emphasis in original).

Furthermore, the Ohio Supreme Court found as a factual matter that: 1) the trial judge permitted an extensive voir dire on the issue of pretrial publicity; 2) "[d]ozens of potential jurors stated that they knew nothing about the case"; and 3) "the trial court excused potential jurors who expressed an inability to set aside preexisting opinions." *Mammone*, *supra*, 139 Ohio St. 3d at 479–80. These presumptively correct factual determinations, which Mammone has not tried to rebut at all – let alone with clear and convincing evidence, *see* 28 U.S.C. § 2254(e)(1) – support the Ohio Supreme Court's reasonable decision that the pretrial publicity, though widespread and

focusing on Mammone's confession, was not so extraordinary as to warrant a presumption of prejudice.

Mammone next faults the Ohio Supreme Court for "entirely discount[ing] the impact of publication of [his] confession letter online where many people could access it continually prior to and during trial." (Doc. 34, PageID 11461).

But the state court did not just write off the impact of social media and the statement's availability online, as Mammone claims. Instead, the Ohio Supreme Court reasoned that "Mammone's generalized claims about . . . social media are insufficient to trigger a presumption of prejudice." *Mammone*, *supra*, 139 Ohio St. 3d at 479. More to the point, the state court explained that there was "no evidence" suggesting that "the social media comments cited 'are representative of the hundreds of thousands of individuals who were eligible to serve as jurors' in his trial." *Id.* at 479 n.1 (quoting *U.S. v. Warren*, 989 F. Supp. 2d 494, 501 (E.D. La. 2013)).

Finally, Mammone suggests that the Ohio Supreme Court was wrong to draw a distinction between the televised confession in *Rideau* and the written confession here, calling this a "distinction without a difference." (Doc. 34, PageID 11461). But this argument is impossible to square with *Rideau*, which emphasized that it was the televised "spectacle" of Rideau's confession, made in jail and in the presence of the authorities, that would have cemented in the community's mind the idea of Rideau's guilt:

> For we hold that it was a denial of due process of law to refuse the request for a change of venue, after the people of Calcasieu Parish had been exposed repeatedly and in depth to the *spectacle of Rideau personally confessing* to the crimes with which he was later to be charged. *For anyone who has ever watched television* the conclusion cannot be avoided that *this spectacle*, to the tens of thousands of people who saw and heard it, in a very real sense was Rideau's trial – at which he pleaded guilty to murder. Any subsequent court proceedings in a

community so pervasively exposed to such a spectacle could be but a hollow formality.

373 U.S. at 726 (emphasis supplied).

Try as Mammone might, it is not possible to separate the televised publication of Rideau's confession from the Court's holding that a presumption of prejudice was warranted in that case.[2] In these circumstances, it was not unreasonable for the Ohio Supreme Court to conclude that the fact that Mammone's confession was written rather than televised, among the other reasons the court gave, distinguished his case in a meaningful way from *Rideau*.

Mammone is not entitled to habeas relief on his presumed-prejudice claim.

### b. Actual Prejudice

The Ohio Supreme Court held that Mammone forfeited his claim of actual prejudice by not "rais[ing] this issue in the trial court or seek[ing] . . . a change of venue hearing after the pretrial venue hearing." *Mammone*, *supra*, 139 Ohio St. 3d at 480. It then held that Mammone could not show plain error because there was "no error" at all. *Id.* at 481.

Rather than address the Warden's procedural-default defense and the attendant questions of cause and prejudice, I will simply address this claim on the merits. In doing so, I follow the Sixth Circuit's decisions in *Stewart v. Trierweiler*, 867 F.3d 633 (6th Cir. 2017), and *Fleming v. Metrish*, 556 F.3d 520 (6th Cir. 2009), which hold that § 2254(d) applies to a state court's plain-error analysis.

Under that standard, Mammone's claim has no merit.

Although Mammone emphasized that "almost every seated juror had either read, heard, discussed or seen an account of the deaths of the Mammone children and their grandmother,"

---

[2] Of course, that does not mean – and the Ohio Supreme Court did not suggest – that the publication of a written confession could never trigger a similar presumption.

*Mammone*, *supra*, 139 Ohio St. 3d at 481, the Ohio Supreme Court reasonably – and correctly – responded that "actual bias is not established simply by pointing out some degree of media exposure." *Id.*

Moreover, of the four seated jurors whom Mammone singled out as biased – Jurors 372, 438, 448, and 461 – two testified that "they had not formed *any* opinions about the case before trial." *Id.* (emphasis in original). Two others "admitted that they had formed some preliminary opinions, but they assured the judge that they could set these opinions aside and be fair." *Id.* As the Ohio Supreme Court explained, the trial judge was "in the best position to judge each juror's demeanor and fairness" and he accepted those answers (without a contemporaneous objection by Mammone). *Id.*

On habeas review, I have "no license to redetermine [the] credibility of witnesses whose demeanor has been observed by the state trial court, but not by" me. *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). This is especially so, given Mammone's failure to come forward with clear and convincing evidence that the jurors actually were biased.

For these reasons, I conclude that the Ohio Supreme Court's holding that Mammone "has not established that any of his jurors were actually biased" was reasonable. *Id.* at 482. Habeas relief is therefore unavailable.

## B. Evidentiary Errors

In his second ground for relief, Mammone alleges that the prosecution improperly displayed three kinds of evidence during the testimony of four prosecution witnesses: 1) crime scene photographs, including pictures of Mammone's murdered children still strapped in their car seats; 2) autopsy photographs of Macy and James; and 3) physical evidence recovered at the

crime scene, including, *inter alia*, the children's car seats and sippy cups, weapons, and items from Mammone's wedding. (Doc. 23, PageID 11183–86).

Mammone contends that the display of this evidence was improper because "the jurors knew that trial counsel was not disputing the manner in which the victims were killed[.]" (*Id.*, PageID 11184). Because "the jurors knew [he] admitted to the murders," Mammone claims there was no reason to display this evidence other than to inflame the jurors' passions. (*Id.*).

In his third ground for relief, Mammone challenges the admission into evidence of the crime-scene photographs of the children in their car seats and their autopsy photos. (*Id.*, PageID 11187–88). He contends that admitting the photographs was "completely unnecessary" because "the details of what transpired that evening were repeatedly and clearly testified to by different witnesses." (*Id.*, PageID 11188). Mammone argues that "[w]hatever marginal utility these photographs may arguably have had was offset by the prejudicial impact they undoubtedly had on the jurors and [his] right to a fair trial." (*Id.*).

The Warden argues that the second claim is meritless and that the third claim is defaulted in part and otherwise meritless. (Doc. 29, PageID 11391–92).

**1. State Court's Decision**

On direct appeal, the Ohio Supreme Court held that Mammone was not entitled to relief on either of these claims.

Regarding the admission of the crime-scene and autopsy photos of Macy and James, the state court held that: 1) the significant probative value of the photos "outweighed the danger of unfair prejudice to Mammone"; and 2) the photos were "neither repetitive nor cumulative":

> {¶ 96}  In the context of capital trials, however, we have established "a stricter evidentiary standard" for admitting gruesome photographs and have "strongly caution[ed] judicious use." *State v. Morales*, 32 Ohio St.3d 252, 257–258, 259, 513 N.E.2d 267 (1987), citing *State v. Maurer*, 15 Ohio St.3d 239, 473 N.E.2d

768, at paragraph seven of the syllabus. A gruesome photograph is admissible only if its "probative value * * * outweigh[s] the danger of prejudice to the defendant." *Morales* at 258, 513 N.E.2d 267. Unlike Evid.R. 403, which turns on whether prejudice substantially outweighs probative value, this standard requires "a simple balancing of the relative values" of prejudice and probative value. *Id.* And even if a photo satisfies the balancing test, it can be "neither repetitive nor cumulative in nature." *Id.*; *see State v. Thompson*, 33 Ohio St.3d 1, 9, 514 N.E.2d 407 (1987). A trial court's decision that a photo satisfies this standard is reviewable only for abuse of discretion. *See State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 69; *Morales* at 257, 513 N.E.2d 267; *Maurer* at 264, 473 N.E.2d 768.

*a. Photos of the crime scene*
{¶ 97}  First, Mammone challenges the introduction of two crime-scene photos, Exhibits 2H and 2I, showing Macy and James dead in their car seats. These photos depict the condition in which police officers found the child victims at the time of Mammone's arrest. Mammone unsuccessfully sought to exclude these photos before trial and again objected to them at trial.

{¶ 98}  Exhibits 2H and 2I had significant probative value. Each photo "illustrated the testimony of the detectives who described the crime scene," and also was "probative of [the defendant's] intent and the manner and circumstances of the victims' deaths." *Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, at ¶ 134, 136; *see also State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 26; *Morales* at 258, 513 N.E.2d 267. Detectives Weirich and Risner testified that upon arriving at the scene, they found the children dead in the back seat of Mammone's car. Macy and James had been stabbed in the throat while strapped into their car seats, unable to move.

{¶ 99}  Mammone nevertheless claims that these photos were "completely unnecessary" because he never denied murdering Macy and James and the state could have proven cause of death "in a less gruesome manner." But we have repeatedly rejected similar arguments in the past. *See Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, at ¶ 70; *Maurer*, 15 Ohio St.3d at 264–265, 473 N.E.2d 768. The state had the burden to prove that Mammone purposely killed the children, and these photos were probative of that issue. *See Maurer* at 265, 473 N.E.2d 768, quoting *State v. Strodes*, 48 Ohio St.2d 113, 116, 357 N.E.2d 375 (1976), vacated in part on other grounds, 438 U.S. 911, 98 S.Ct. 3135, 57 L.Ed.2d 1154 (1978) ("'[t]he state must prove, and the jury must find, that the killing was purposely done' ").

{¶ 100}  Under these circumstances, we conclude that the probative value of these two photos outweighed the danger of unfair prejudice to Mammone and that the photos "were neither repetitive nor cumulative in nature." *Morales*, 32 Ohio St.3d at 258, 513 N.E.2d 267. The prosecution selected, and the trial court admitted, a single photo of each child victim from 34 available crime-scene

photos showing Mammone's car with the children inside. These two photos were published to the jury only once, although two witnesses authenticated them during their testimony. Accordingly, the trial court did not abuse its discretion by admitting Exhibits 2H and 2I.

### b. Autopsy photos

{ ¶ 101} Mammone also challenges the admission of autopsy photos "of very young children." The trial court admitted six autopsy photos of James's injuries, Exhibits 5A–F, and seven of Macy's, Exhibits 6A–G. Defense counsel unsuccessfully sought to exclude these photos both before trial and during the coroner's testimony at trial. But notably, Mammone personally thanked the court during his allocution "for the discretion used in, ah, limiting the, ah, display of autopsy photos for the deceased in this matter."

{ ¶ 102} Exhibits 5A–F and 6A–G had significant probative value. As mentioned above, the state was required to prove that Mammone purposely killed Macy and James. See *Maurer*, 15 Ohio St.3d at 265, 473 N.E.2d 768. The number and location of the children's injuries and the resulting wounds were all probative evidence of a purpose to cause death. *Id.* In addition, each photo supported and illustrated the coroner's testimony about the wounds inflicted on Macy and James and the cause of their deaths. *Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, at ¶ 148; *Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, at ¶ 26; *Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, at ¶ 72.

{ ¶ 103} As with the crime-scene photos, Mammone contends that the prejudicial impact of showing the jury gruesome autopsy photos of young children outweighed this probative value. Mammone asserts that the photos were unnecessary because he did not dispute the cause of the children's deaths and because the state could have used testimony alone to prove the children's injuries. But, as explained above, the state bears the burden of proof and it has no obligation to meet that burden in the least gruesome way. Consistent with our previous holdings in cases involving children, we conclude that the prejudicial impact of these autopsy photos did not outweigh their probative value. *See, e.g., Vrabel* at ¶ 69–72; *Trimble* at ¶ 142–145, 155.

{ ¶ 104} Further, these photos were neither repetitive nor cumulative. At trial, the state offered seven of the more than 100 photographs taken during Macy's autopsy. Each photo presents a different injury. Exhibit 6A depicts Macy as she arrived at the coroner's office, still strapped in her car seat. Exhibits 6B, 6D, and 6E show different knife wounds: (1) three wounds to Macy's left lower face and upper neck, severing her esophagus and trachea, (2) a cluster of three wounds on Macy's left neck, and (3) an exit wound. Exhibits 6C and 6F depict defensive wounds on Macy's right hand and right leg, respectively. Finally, Exhibit 6G shows finger-shaped bruises on Macy's left leg, consistent with someone having a firm grip on that spot.

{¶ 105} Likewise, each of the six autopsy photos of James depicts something different: (1) Exhibit 5B shows a defensive wound on James's right palm, (2) Exhibit 5E depicts a large stab wound on James's neck, transecting his esophagus and trachea and cutting through to his back, (3) Exhibit 5F depicts the exit wound on James's upper left back, (4) Exhibit 5A captures a close-up of James's hands, (5) Exhibit 5C shows a view of the stab wound on his neck from the other side of his head, and (6) Exhibit 5D shows injuries on his right arm, including the defensive wound on his right hand. Like the autopsy photos of Macy, none of these photos is cumulative or repetitive.

{¶ 106} For these reasons, we find no abuse of discretion in the admission of these autopsy photos.

*Mammone*, *supra*, 139 Ohio St. 3d at 486–89.

In a footnote, the Ohio Supreme Court added that any error in admitting this evidence was "harmless beyond a reasonable doubt." *Id.* at 489 n.5. This was so, the court explained, because "[t]he evidence that Mammone murdered Macy and James was overwhelming: Mammone confessed these crimes to law enforcement in detail, and the jury heard his recorded confession at trial." *Id.*

As for the admission of the physical evidence collected at the crime scene, and the display of that evidence and the autopsy and crime-scene photos during the testimony of prosecution witnesses, the Ohio Supreme Court held that the trial court committed no error.[3] According to the state high court:

{¶ 117} Mammone objects that the prosecution engaged in inappropriate theatrics by introducing specific evidence during the testimony of four witnesses. For the reasons explained below, this evidence was properly admitted.

{¶ 118} First, Mammone argues that the prosecution introduced a photo of Macy and James, dead in their car seats, during Detective Risner's testimony solely for "shock value." Risner testified regarding his arrest of Mammone on the morning

_____

[3] Mammone raised these issues in state court as part of a claim that the prosecution engaged in "inappropriate theatrics" by seeking to admit and display this evidence to the jury. The Ohio Supreme Court concluded that the claims were, "[a]t bottom . . . evidentiary claims," and analyzed them on that basis. *Mammone*, *supra*, 139 Ohio St. 3d at 491.

of June 8. While handcuffing Mammone and removing him from his car, Risner looked through the windows and saw a pistol near Mammone's leg and two dead children strapped in car seats. During Risner's testimony, the state offered a single photograph depicting the back seat of the car at the time of Mammone's arrest. The trial court admitted the photo over a defense objection, explaining that it was "necessary as to what [Risner] observed and [was] not unduly prejudicial given the totality of the testimony."

{¶ 119} Risner's testimony and the photo were admissible because they were probative of Mammone's guilt for the charged offenses. Moreover, as discussed in the analysis of proposition V, the photo satisfies the standard for admitting gruesome photos in capital cases. Accordingly, the trial court did not abuse its discretion by permitting this evidence, and the prosecutor did not engage in misconduct by offering it.

{¶ 120} Second, Mammone argues that the prosecution engaged in "theatrics" by introducing during Detective Weirich's testimony physical evidence that had been in Mammone's car when he was arrested. Weirich collected evidence, took photographs, and processed the crime scenes. At trial, Weirich identified the photos and physical evidence, which was important to establish the chain of custody for several of the state's exhibits. The prosecution introduced items Weirich found in Mammone's car, including weapons, a wedding photo of Marcia, Marcia's dried wedding bouquet, car seats, sippy cups, children's blankets, diapers, sleepers, children's clothing, and diaper/overnight bags. Mammone did not object to Weirich's testimony or these exhibits at trial, but he now claims that the physical evidence had no probative value. Mammone reasons that Risner had already described the scene and the jury had already seen the photo of the children dead in their car seats, so the additional evidence was not probative.

{¶ 121} The trial court did not err by admitting this evidence because it was relevant to proving the offenses charged. This physical evidence supported a finding that Mammone acted with purpose when he committed the three murders; he planned ahead for the evening, bringing a host of weapons and supplies for the children with him. In addition, the presence of the wedding bouquet and wedding photo confirms that he acted with Marcia in mind, consistent with his admission that he knew the murders would be a major blow to Marcia, in revenge for their destroyed marriage. Weirich's description of the scene and the photograph of the children could not simply replace this physical evidence; instead, they supplemented it.

{¶ 122} But even if any of this evidence had been admitted in error, Mammone cannot show that it was outcome-determinative. See Crim.R. 52(B). Mammone gave a full confession to the crimes and, for the most part, did not contest the facts of the murders. He cannot persuasively argue that the exclusion of any, or all, of this physical evidence would have led to a different outcome at his trial.

{¶ 123} Third, Mammone objects to the prosecution's introduction during Dr. Murthy's testimony of several autopsy photos of the children as well as the children's car seats, clothing, and other personal belongings found in Mammone's car. The trial court admitted the autopsy photos over defense objection, but Mammone did not object to the physical evidence at trial. Mammone now argues that all this evidence was irrelevant and lacked probative value.

{¶ 124} This claim fails. The autopsy photos were properly admitted for the reasons explained in our analysis of proposition V. And the physical evidence collected from Mammone's car was admissible to illustrate the nature and circumstances of the crime. The car seats and children's clothing supported Dr. Murthy's testimony about the state of the children's bodies when he received them at the coroner's office. Moreover, even if any of this physical evidence had been improperly admitted, Mammone cannot establish that the error was outcome-determinative.

{¶ 125} Finally, Mammone argues that it was improper for Michael Short to testify about the children's bloody car seats. Mammone did not object to this testimony at trial, but he now claims that the testimony was improper for three reasons: (1) two witnesses had already discussed the car seats, (2) the jury did not need Short's testimony to point out the apparent blood on the car seats, and (3) Short was introduced as a firearms expert.

{¶ 126} Mammone's first two arguments fail for several reasons. First, no other witness testified about the car seats from the perspective of a forensic analyst. Instead, a police officer discussed the car seats when describing his activity at the crime scene, and the coroner discussed the car seats because the children arrived at his office in the seats. Second, the fact that a jury can draw its own conclusions by observing physical evidence does not preclude a witness—particularly a forensic expert—from testifying about his own conclusions drawn from the evidence.

{¶ 127} Mammone also contends that because the court recognized Short as an expert "qualified to render opinions in the area of firearms and fingerprints," Short could not opine about blood on car seats. Short testified that he is a criminalist with responsibility "for either assisting with forensic support or actually going out and responding and processing the major crime scenes in Stark County." He explained that he had examined the car seats for defects such as those consistent with knife slashes and briefly described one of the car seats as "saturated with apparent blood." The trial court arguably defined Short's expertise too narrowly or erred by letting him offer expert testimony about the car seats. And if Mammone had objected during the trial, the court easily could have addressed these concerns. However, Mammone did not object, and he cannot now establish that but for Short's testimony about the car seats, the outcome of his trial would have differed.

{ ¶ 128}  For these reasons, the evidence Mammone objected to at trial was properly admitted, and no plain error occurred with regard to evidence that Mammone did not object to at trial. As a result, Mammone's claim that the prosecutor engaged in improper "theatrics" by introducing this evidence likewise fails.

*2) Evidence with no probative value*
{ ¶ 129}  Mammone next argues that misconduct occurred when the prosecutor introduced evidence that allegedly lacked any probative value.

\*   \*   \*

{ ¶ 131}  First, Mammone objects to "[a]utopsy photos of dead children" and "a photo of dead children in their car seats." These photos were relevant and admissible for the reasons explained in our analysis of proposition V.

{ ¶ 132}  Second, Mammone objects to the admission of the children's bloodstained car seats and their belongings found in Mammone's car. This evidence was relevant and admissible because it was probative of Mammone's intent and of the manner and circumstances of the children's deaths. *See State v. Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, ¶ 65.

\*   \*   \*

{ ¶ 135}  None of this evidence was more prejudicial than probative. Nor was it unduly cumulative or repetitive. Instead, this evidence illustrated the testimony of different state witnesses, each of whom contributed to the prosecution's case against Mammone. And because none of this evidence was erroneously admitted, the prosecution's decision to introduce it did not deprive Mammone of due process or a fair trial.

*Mammone*, *supra*, 139 Ohio St. 3d at 491–95.

## 2. Analysis

Habeas relief is not available for a state court's evidentiary ruling unless the ruling was "so egregious that it resulted in a denial of fundamental fairness." *Giles v. Schotten*, 449 F.3d 698, 704 (6th Cir. 2004); *see also Estelle v. McGuire*, 502 U.S. 62, 68 (1991). Mammone has not established that any of the state trial court's rulings was that egregious (or even, quite candidly,

incorrect) – let alone that the Ohio Supreme Court's decision rejecting his claims was contrary to, or involved an unreasonable application, of Supreme Court precedent.

As the state court explained, the crime-scene photos depicting Mammone's murdered children had "significant probative value." *Mammone*, 139 Ohio St. 3d at 487. They were highly probative of Mammone's intent and therefore relevant on the issue whether he intentionally and purposefully killed his children. The same is true of the autopsy photos, which showed the nature of the fatal wounds as well as a number of apparent defensive wounds on the children's hands and arms. *Id.* at 488.

It is no answer for Mammone to emphasize that the defense did not dispute the manner of the children's' deaths. (Doc. 23, PageID 11184). Because Mammone entered a not-guilty plea, the prosecution had to prove its case at the guilt phase beyond a reasonable doubt. "[N]othing in the Due Process Clause of the Fourteenth Amendment requires the State to refrain from introducing relevant evidence simply because the defense chooses not to contest the point." *Estelle*, *supra*, 502 U.S. at 70.

Nor is there merit in Mammone's claim that the trial court erred in admitting physical evidence from the crime scene. As the Ohio Supreme Court reasonably concluded, this evidence "supported a finding that Mammone acted with purpose" and that "he planned ahead for the evening, bringing a host of weapons and supplies for the children with him." *Mammone*, *supra*, 139 Ohio St. 3d at 492.

Finally, it was not unreasonable for the Ohio Supreme Court to hold that the testimony of a coroner, Dr. Murthy, and a criminalist, Michael Short, was relevant, probative, and not unduly

prejudicial. *Id.* at 492–93.[4] As the state court explained, both witnesses brought unique, non-cumulative perspectives to bear on the evidence at the crime scene.

For these reasons, Mammone is not entitled to relief on his second and third claims.

## C. Juror Bias in Favor of Capital Punishment

In his fourth ground for relief, Mammone alleges that two jurors were biased in favor of the death penalty. (Doc. 23, PageID 11189–92).

He contends that Juror 418 stated during voir dire that "part of her belief system was 'an eye for an eye.'" (*Id.*, PageID 11190). Mammone also notes that this juror believed that if a defendant were of "sound mind and went out and did this thing anyhow, then yes, I think that it should be an eye for an eye definitely," "especially" if there were "small children involved." (*Id.*).

Mammone argues that Juror 448 testified during voir dire that he believed that "an eye for an eye" came from the Bible, and that the death penalty is the proper punishment for all cases of aggravated murder. (*Id.*, PageID 11191). Mammone notes that Juror 448 spoke unfavorably about incarceration as a form of punishment, which he believed "does virtually no good." (*Id.*).

The Warden argues that Mammone defaulted the claim, and that the claim is meritless in any event. (Doc. 29, PageID 11393–94).

## 1. State Court's Decision

On direct appeal, the Ohio Supreme Court held that Mammone forfeited this claim by failing to object to either juror during voir dire. *Mammone*, *supra*, 139 Ohio St. 3d at 483, 484. It then determined that neither juror was biased in favor of capital punishment:

---

[4] The Ohio Supreme Court held that Mammone forfeited some components of these claims, but ruled that there was no plain error. Accordingly, I have bypassed the Warden's default arguments and considered the claims under § 2254(d). *Stewart*, *supra*, 867 F.3d at 638.

*a. Juror No. 418*

{ ¶ 79} Mammone argues that juror No. 418 was "unfairly biased in favor of the death penalty" and "could not fairly consider all the possible sentencing options in this case." Mammone did not challenge juror No. 418 for cause, so we review this claim of bias for plain error. *See id.*

{ ¶ 80} Juror No. 418's views on the death penalty were explored in several ways during voir dire. On her written questionnaire inquiring into her views on capital punishment, juror No. 418 stated her belief "that the punishment should fit the crime" and stated that if a defendant "is found guilty without doubt of taking another person's life, he indeed is not entitled to live out his own life." She indicated that the death penalty is "[g]enerally the proper punishment" for aggravated murder, "with very few exceptions." However, she acknowledged that "there may be circumstances—such as, mental disability—" in which it is not appropriate. Ultimately, juror No. 418 expressed her belief "that the death penalty is appropriate in *some* capital murder cases." (Emphasis added.)

{ ¶ 81} During voir dire, defense counsel questioned juror No. 418 to determine whether she would automatically impose a death sentence if Mammone were convicted. The juror again explained that she generally thinks "punishment should fit the crime," but that she does not firmly believe that every murderer should receive the death penalty. She observed that "sometimes there are circumstances that you need to think about," such as "a mental issue" or "those types of things." In the absence of such circumstances, however, juror No. 418 stated that "it should be an eye for an eye definitely, and especially where there [are] small children involved where it sounds like there was [here]."

{ ¶ 82} Juror No. 418 never indicated that she would automatically impose the death penalty if Mammone were convicted. Her questionnaire and her verbal responses indicated a general preference for the death penalty for those who commit aggravated murder, but she consistently acknowledged exceptions—both before and after the trial court explained the two phases of a capital trial and the jury's duty to weigh aggravating circumstances and mitigating factors. *See State v. Stojetz*, 84 Ohio St.3d 452, 460, 705 N.E.2d 329 (1999) (rejecting argument that a juror was an "automatic death penalty juror" when the juror had "expressed a willingness to take into consideration other factors, such as defendant's background and the nature and circumstances of the crime, before deciding to render a death verdict").

{ ¶ 83} "[D]eference must be accorded to the trial judge who sees and hears the juror." *Id*. Here, neither the court nor the parties expressed any concern that juror No. 418 was an "automatic death" juror, even as they discussed concerns about other prospective jurors in the same small-group voir dire. Under these circumstances, we defer to the trial judge's decision to seat juror No. 418 and find no error with respect to her service.

*b. Juror No. 448*

{¶ 84} Mammone also argues that juror No. 448 was "unfairly biased in favor of the death penalty" and "could not fairly consider all the possible sentencing options in this case." As with juror No. 418, Mammone did not challenge juror No. 448 for cause, so plain-error review applies. *Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, at ¶ 89–90.

{¶ 85} During larger-group voir dire, the trial judge flagged juror No. 448 as a juror to discuss with counsel. Juror No. 448 had responded to a question from defense counsel by stating, "I think I would have some problem with" being fair given the circumstances of the case. Later, the court and counsel for both sides discussed whether to have this juror return for small-group voir dire. The prosecutor indicated that she "want[ed] the opportunity to explore why" juror No. 448 had "said I can't be fair." The court agreed that juror No. 448 should remain in the jury pool, and the defense made no effort to excuse the juror.

{¶ 86} Juror No. 448 first indicated his attitude toward the death penalty on his written questionnaire asking for his views on that subject. His responses revealed some tension in his thoughts about capital punishment. On the one hand, juror No. 448 wrote that he supported "the state law and right to enforce the death penalty"—which he characterized as a "God-ordained law of the land"—and he indicated agreement with the view that the death penalty is the "proper punishment in all cases where someone is convicted of aggravated murder." On the other hand, he also wrote, "I am not sure due to my religious views if I could give a death penalty verdict."

{¶ 87} During small-group voir dire, the judge and both parties explored this tension. Juror No. 448 assured the judge that even though he had "some religious problems with it," he recognized the state's authority to impose the death penalty and "would want to follow [the court's] orders." He later explained that even though his church "in general leans toward being" pacifistic, he "believes that an eye for an eye is in the Bible."

{¶ 88} During prosecution questioning, juror No. 448 expressed a preference for the death penalty in all cases of aggravated murder. But he later clarified that he could not say for sure whether if there were a conviction he would sentence Mammone to death; he "would have to look at the evidence." The prosecutor explained that mitigating factors "are things that might cause [a juror] to consider a sentence less than death," and juror No. 448 responded that he would follow "the law of the land" and "would consider" such a sentence. The prosecutor again asked, "So you'll follow the Judge's instructions?" The juror said yes. But to defense counsel he again indicated in response to further questioning that if Mammone were convicted of aggravated murder, he "would tend or would vote for capital punishment."

{¶ 89} The judge and the parties did not later specifically analyze juror No. 448's attitudes about the death penalty because neither party challenged him for cause. However, the trial court did comment on juror No. 448's responses when analyzing a challenge to juror No. 412. The court observed that juror Nos. 412 and 448 had both "given answers which would indicate a natural inclination to lean towards the death penalty." But the court went on to explain that "[s]ometimes in a vacuum it's hard for jurors to articulate how they feel about [the death penalty], and so it comes down to the basics of whether or not they would follow the law fairly, and that's why I pushed them on fairly." The court then denied the challenge to juror No. 412, and there was no further discussion of juror No. 448.

{¶ 90} The trial judge's comments are consistent with this court's past observations regarding the difficulty of having prospective jurors articulate their views on capital punishment during voir dire. Many prospective jurors in a death-penalty case are being asked "to face their views about the death penalty" "for the first time" during voir dire. *Williams*, 79 Ohio St.3d at 6, 679 N.E.2d 646. "[I]t is not uncommon for jurors to express themselves in contradictory and ambiguous ways" in this context, "both due to unfamiliarity with courtroom proceedings and cross-examination tactics and because the jury pool runs the spectrum in terms of education and experience." *White v. Mitchell*, 431 F.3d 517, 537 (6th Cir.2005), citing *Patton v. Yount*, 467 U.S. 1025, 1039, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). Moreover, even when a prospective juror does have "very strongly held views" about the death penalty, he or she likely has "never had to define them within the context of following the law." *Williams* at 6, 679 N.E.2d 646.

{¶ 91} During voir dire, both parties may be "attempting to push a prospective juror into a certain position in order to remove him or her from the jury." *Id*. at 7–8, 679 N.E.2d 646. Accordingly, "it is often necessary for the trial judge to step in and provide some neutral, nonleading instructions and questions in an attempt to determine whether the prospective juror can actually be fair and impartial." *Id*. at 8, 679 N.E.2d 646. It then falls naturally on the "trial judge to sort through [the] responses and determine whether the prospective jurors will be able to follow the law." *Id*. at 6, 679 N.E.2d 646.

{¶ 92} In this case, neither the judge nor the parties ultimately expressed reservations that juror No. 448 was biased in favor of the death penalty. When asked, the juror agreed that he could follow the trial judge's instructions on mitigating factors. The judge was able to "see[ ] and hear[ ]" juror No. 448, *Wainwright v. Witt*, 469 U.S. at 426, 105 S.Ct. 844, 83 L.Ed.2d 841, and therefore had "the benefit of observing [the juror's] demeanor and body language." *Williams*, 79 Ohio St.3d at 8, 679 N.E.2d 646. The judge was satisfied that juror No. 448 would follow instructions, and we defer to that judgment. *See Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, at ¶ 40 (no abuse of discretion in denying challenge for cause when "a juror, even one predisposed in

favor of imposing death, states that he or she will follow the law and the court's instructions").

*Mammone*, *supra*, 139 Ohio St. 3d at 483–86.

## 2. Analysis

"In a death penalty case, a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath." *Trimble v. Bobby*, 804 F.3d 767, 777–78 (6th Cir. 2015).

"A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). "If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." *Id.*

In reviewing this claim, I bear in mind that "it is not uncommon for jurors to express themselves in contradictory and ambiguous ways, both due to unfamiliarity with courtroom proceedings and cross-examination and because the jury pool runs the spectrum in terms of education and experience." *White v. Mitchell*, 431 F.3d 517, 537 (6th Cir. 2005). "As a result, the trial court's determination on a given juror's credibility is entitled to 'special deference.'" *Id.* (quoting *Patton v. Yount*, 467 U.S. 1025, 1038 (1984)).

The Ohio Supreme Court did not unreasonably apply Supreme Court precedent or unreasonably determine the facts when it rejected Mammone's claim.

### a. Juror 418

First, the record supplies little basis to exclude Juror 418 on the ground that she was incapable of considering a sentence other than death.

Juror 418 acknowledged her belief that the "punishment should fit the crime," a belief that was, in her words, "basically the same thing" as "an eye for an eye." (Doc. 11–2, PageID 4539). She then testified that "there could possibly be circumstances" – such as mental illness, for example – that "should come into consideration" when deciding if someone convicted of aggravated murder should receive a death sentence. (*Id.*, PageID 4540). Juror 418 then reiterated her view that, "if they are of sound mind and went out and did this thing anyhow, then yes, I think that it should be an eye for an eye definitely, and especially where there is [*sic*] small children involved[.]" (*Id.*).

She concluded this portion of her voir dire by telling defense counsel that "this person that's in the courtroom as far as I'm concerned, he's innocent right now." (*Id.*, PageID 4540–41).

Nowhere did Juror 418 testify that she was incapable of considering a sentence other than death or that she would not or could not consider the mitigating factors. Indeed, her voir dire established that she was willing to consider the mitigating circumstances and that she would follow the law and the trial court's instructions. (*Id.*, PageID 4540).

In the end, Juror 418 expressed a preference – perhaps a very strong preference – for sentencing a convicted murderer to death. But Juror 418 also told the trial court that she could and would set aside that preference and follow the law. There was nothing unreasonable in the Ohio Supreme Court's judgment affirming the trial court's decision to allow Juror 418 to serve.

### b. Juror 448

Likewise, Juror 448 insisted that he could and would follow the law, notwithstanding his belief in "an eye for an eye" and a statement on his juror questionnaire that the death penalty was "proper in all cases where a person is convicted of aggravated murder." (Doc. 11–2, PageID

4526–27). Indeed, he testified that he would consider the mitigating factors because it was "[t]he rule of the law of the land." (*Id.*, PageID 4528–29).

"The judge and the parties did not later specifically analyze juror No. 448's attitudes about the death penalty because neither party challenged him for cause." *Mammone*, *supra*, 139 Ohio St. 3d at 485. But the trial court "was satisfied that juror No. 448 would follow instructions," and the Ohio Supreme Court "defer[red]" – permissibly and reasonably – "to that judgment." *Id.* The trial court was in the best position to determine whether Juror 448 was sincere in his statements that he could follow the law, *see Wainwright v. Witt*, 469 U.S. 412, 430 (1985), and there is ample evidence in the transcript of voir dire to support the trial court's judgment.

Habeas relief is therefore unavailable.

### D. Ineffective Assistance of Trial Counsel – Guilt Phase

In his fifth, fourteenth, and nineteenth grounds for relief, Mammone alleges that trial counsel were ineffective during the guilt phase.

According to Mammone, counsel were ineffective for not: 1) conducting an adequate voir dire of Juror 430, an alleged "automatic death penalty" juror, and objecting to him serving on the jury (Doc. 23, PageID 11192–94); 2) moving to excuse Jurors 418 and 448 for cause; (*id.*, PageID 11232–33); 3) objecting to the admission of the crime-scene photos, evidence recovered at the crime scene, text-message exchanges between Mammone and his wife, and the various 911 calls introduced at trial (*id.*, PageID 11243); and 4) raising a not-guilty-by-reason-of-insanity defense (*id.*, Page ID 11272–76).

### 1. The *Strickland* Standard

To prevail on his ineffective-assistance claim, Mammone must "show both that his counsel provided deficient assistance and that there was prejudice as a result." *Harrington*, *supra*, 562 U.S. at 104.

The performance prong calls for "an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Id.* at 110. My review of counsel's performance is highly deferential, and I am "required not simply to give [counsel] the benefit of the doubt, but to affirmatively entertain the range of possible reasons counsel may have had for proceeding as [they] did." *Pinholster*, *supra*, 563 U.S. at 196.

"With respect to prejudice, a challenger must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Harrington*, *supra*, 562 U.S. at 104. "This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case." *Id.* at 112.

"Surmounting *Strickland*'s bar is never an easy task," but "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Id.* at 105.

### 2. Juror 430: The "Automatic Death Penalty" Juror

Mammone contends that Juror 430 was an "automatic death penalty" juror who could not consider a sentence other than death. The Warden argues that this claim is procedurally defaulted and without merit. (Doc. 29, 11400–01).

### a. Background

During voir dire, Juror 430 stated that, "in my personal opinion of the death penalty, you know, Manson murders, something like that, you know, I know that there is [*sic*] different murders, and not all murders require the death penalty but certain ones do. And if it is proven to be that, then I believe that it needs to be that." (Doc. 11–2, PageID 4522–23).

Under questioning by defense counsel, Juror 430 elaborated on his beliefs:

Juror 430:    Like I told the other attorney, you know, there are circumstances that do require the death penalty, and there are circumstances that don't, and I don't know what the circumstance is right now.

Mr. Lowry:    Can you describe for me what circumstances in your mind would result in, should result in the death penalty?

Juror 430:    Like the guy down, I think it was in Texas maybe, that killed all of those people down in Texas.

Mr. Lowry:    You're talking about Fort Hood?

Juror 430:    Fort Hood.

Mr. Lowry:    The military base.

Juror 430:    From what I've seen in the paper about that; yes, I think he deserved the death penalty, but I can't say that I'm going to impose that on him because I'm not there. I don't know what went down officially, but if somebody just snaps and kills people, do they deserve the death penalty? No, I don't agree with that.

(*Id.*, PageID 4549–50).

Juror 430 had also indicated on his juror questionnaire that "in my eyes cold blood murder is capital punishment."

After the trial ended, Mammone contends, Juror 430 told an investigator working for the public defender's office that "there was nothing that the defense attorneys could have done during the mitigation phase of Mr. Mammone's trial that would have changed his decision

regarding the death penalty." (Doc. 23, PageID 11194). As it turns out, Juror 430 said no such thing: the quoted passage represents Mammone's habeas counsel's rather optimistic gloss on Juror 430's statement to the investigator that "anyone who commits a premeditated murder should receive the death penalty." (Doc. 10–22, PageID 2109).

Mammone argued in his postconviction petition that trial counsel were ineffective for not exposing Juror 430 as an "automatic death penalty" juror and removing him from the venire. The state trial court held that this claim was "res judicata and barred from consideration in this proceeding" (*id.*, PageID 2433–34), and the Ohio Court of Appeals affirmed:

> Secondly, appellant argued his trial counsel was ineffective for failing to properly question Juror No. 430 and failing to remove this juror from the panel. This issue is ripe for appellant's direct appeal and is therefore barred under *State v. Perry* (1967), 10 Ohio St.2d 175, 226 N.E. 104.

*Mammone II*, *supra*, 2012 WL 3200685 at *3.

### b. Procedural Default

Mammone is not entitled to relief on this ineffectiveness claim because it is procedurally defaulted, and there are no grounds to excuse the default.

First, Ohio's res-judicata rule is an independent and adequate ground of decision that, if invoked by the Ohio courts – as it was here – precludes federal habeas review. *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006).

Second, Mammone's claim that appellate counsel was ineffective for not raising this trial-counsel claim (Doc. 23, PageID 11192–93) lacks merit and thus cannot excuse Mammone's default. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).

It is "a bedrock principle of appellate practice in Ohio . . . that an appeals court is limited to the record of the proceedings at trial[.]" *McGuire*, *supra*, 738 F.3d at 751 (internal quotation marks omitted). This trial-counsel claim, however, depends on evidence that was not part of the

direct-appeal record: namely, Juror 430's statement to the public defender's investigator. "That being so, appellate counsel cannot be said to have been ineffective for failing to raise on direct appeal . . . a claim that relied on evidence outside the trial record." *Cowans v. Bagley*, 624 F. Supp. 2d 709, 783 (S.D. Ohio 2008).

Controlling principles of appellate practice aside, the record does not establish that Juror 430 was an "automatic death penalty" juror.

To be sure, Juror 430, like many veniremembers, had a strong belief that, at least in the abstract, those convicted of aggravated murder should receive a death sentence. Critically, though, Juror 430 agreed that he could not decide whether a death sentence was warranted in a given case without hearing the evidence and the trial court's instructions on the law. (Doc. 11–2, PageID 4549–50). Nowhere did Juror 430 testify, as Mammone has misleadingly claimed, that he would disregard or otherwise refuse to consider the defense's mitigation evidence.

For these two independent reasons, there was no probability appellate counsel could have prevailed on a claim that trial counsel were ineffective for not challenging Juror 430 for cause. *Kelly v. Lazaroff*, 846 F.3d 819, 831 (6th Cir. 2017) ("appellate counsel cannot be considered ineffective for failing to raise a meritless claim"). Habeas relief is therefore unavailable.

### 3. Inadequate Voir Dire

Mammone next claims that trial counsel were ineffective for not moving to exclude Jurors 418 and 448 on the ground that they were biased in favor of the death penalty, questioning the veniremembers in greater detail about the publicity surrounding Mammone's case, and examining in more depth their ability and willingness to consider the defense's mitigating evidence.

The Ohio Supreme Court rejected these contentions on direct appeal, holding that

counsel's handling of voir dire was reasonable and that Mammone could not show prejudice:

*a. Voir dire*
{ ¶ 152}  Mammone contends that counsel rendered ineffective assistance at voir
dire by failing to adequately question potential jurors about possible bias in favor
of the death penalty, about exposure to pretrial publicity, and about their ability to
understand and consider mitigating factors. He also alleges that counsel were
ineffective for not challenging jurors for cause on these grounds.

{ ¶ 153}  When evaluating claims of ineffective assistance at voir dire, this court
has "consistently declined to 'second-guess trial strategy decisions' or impose
'hindsight views about how current counsel might have voir dired the jury
differently.'" *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d
828, ¶ 63, quoting *State v. Mason*, 82 Ohio St.3d 144, 157, 694 N.E.2d 932
(1998). Decisions about voir dire are highly subjective and prone to individual
attorney strategy because they are often based on intangible factors. *Mundt* at ¶
64, citing *Miller v. Francis*, 269 F.3d 609, 620 (6th Cir.2001). Accordingly,
"counsel is in the best position to determine whether any potential juror should be
questioned and to what extent." *State v. Murphy*, 91 Ohio St.3d 516, 539, 747
N.E.2d 765 (2001).

{ ¶ 154}  First, Mammone argues that counsel did not adequately question or
challenge two jurors, juror Nos. 418 and 448, for cause. According to Mammone,
these two jurors "clearly indicated during voir dire that they could not fairly
consider all the possible sentencing options in this case." But counsel did not
provide deficient performance in this regard because, as explained in our analysis
of proposition II, these jurors' views on the death penalty were extensively probed
during voir dire. Neither party, nor the judge, expressed reservations that either
juror No. 418 or No. 448 was biased in favor of the death penalty. And even now,
Mammone does not identify any questions that counsel should have asked during
voir dire. Under these circumstances, we find that counsel's decision not to
inquire further was objectively reasonable. In fact, defense counsel could well
have made a strategic decision not to challenge either juror for cause. *See State v.
Cornwell*, 86 Ohio St.3d 560, 569, 715 N.E.2d 1144 (1999) ("we will not second-
guess trial strategy decisions such as those made in voir dire").

{ ¶ 155}  Second, Mammone argues that counsel failed to adequately voir dire
and challenge jurors as to pretrial publicity. As discussed in the analysis of
proposition I, every potential juror completed a publicity questionnaire and was
questioned about exposure to publicity during voir dire. Thus, counsel's failure to
ask additional questions was not objectively unreasonable. Moreover, the trial
court, which was in the best "position to judge each juror's demeanor and
fairness," concluded that every juror and alternate selected—including the four
Mammone specifically expresses concern about—could be fair and impartial.

*State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, at ¶ 64. Accordingly, counsel's performance was not deficient in this regard.

{ ¶ 156}  Finally, Mammone argues that counsel's performance was deficient in failing "to voir dire jurors as to their ability to consider mitigating factors." The record indicates that the prosecutor thoroughly explained mitigation to the jurors and questioned them about whether they would be able to balance the aggravating circumstances against mitigating factors. Defense counsel then posed additional questions about possible mitigating factors, and the trial court itself inquired further when necessary. The fact that defense counsel did not decide to ask additional questions or to press every single potential juror on this issue—or to inquire about specific mitigating factors—is reasonable as a matter of strategy. *See Murphy*, 91 Ohio St.3d at 539, 747 N.E.2d 765.

{ ¶ 157}  Even if counsel's performance at voir dire had been deficient in one or more of these ways, Mammone cannot establish prejudice under *Strickland*. He has failed to establish a reasonable probability that but for counsel's allegedly deficient performance at voir dire, the result of the trial would have been different. *See, e.g., State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, at ¶ 67.

{ ¶ 158}  For these reasons, we find that counsel did not render ineffective assistance during voir dire.

*Mammone*, *supra*, 139 Ohio St. 3d at 499–501.

The state high court's reasonable application of *Strickland* bars relitigation of these ineffective-assistance claims here.

As the Ohio Supreme Court found, and as the record establishes, Juror 418's and Juror 448's "views on the death penalty *were* extensively probed during voir dire," and neither the parties nor the trial judge "expressed reservations that either juror No. 418 or No. 448 was biased in favor of the death penalty." *Mammone*, *supra*, 139 Ohio St. 3d at 500 (emphasis in original). Seeming to underscore these points, on direct appeal Mammone was unable to "identify any questions that counsel *should* have asked during voir dire" to better probe or establish their supposed bias. *Id.* (emphasis in original).

49

Likewise, the Ohio Supreme Court reasonably rejected the claim based on counsel's alleged failure to voir dire the veniremembers more extensively about pretrial publicity.

"[E]very potential juror completed a publicity questionnaire and was questioned about exposure to publicity during voir dire." *Mammone*, *supra*, 139 Ohio St. 3d at 500. Furthermore, the trial judge questioned all seated jurors and "concluded that every juror and alternate selected – including the four Mammone specifically expresses concern about – could be fair and impartial." *Id.*

For these reasons, it was permissible for the state court to hold that "counsel's failure to ask additional questions was not objectively unreasonable." *Id.*

Finally, the record provides ample support for the state court's decision that trial counsel reasonably examined veniremembers about their ability to consider the mitigating factors.

The prosecutor, defense counsel, and the trial court all questioned the jurors about the concept of mitigation evidence and the jurors' willingness to consider those factors and weigh them against any aggravating factors that the prosecution proved. "The fact that defense counsel did not decide to ask additional questions or to press every single potential juror on this issue – or to inquire about specific mitigating factors – is reasonable[.]" *Id.*

Because Mammone has not shown that the Ohio Supreme Court unreasonably decided the performance prong of his *Strickland* claim, habeas relief is unavailable.

### 4. Objections to Alleged Prosecutorial Misconduct

Mammone alleges that trial counsel were ineffective for not objecting to the prosecution's alleged misconduct in seeking to admit and display crime-scene and autopsy photographs of Mammone's children and evidence from the crime scene. The Ohio Supreme Court, having previously ruled that this evidence was relevant, probative, and admissible,

rejected Mammone's claim that trial counsel was ineffective for not objecting to the admission of this evidence. *Mammone*, *supra*, 139 Ohio St. 3d at 501.

That decision was neither contrary to, nor an unreasonable application of, *Strickland*.

"[A]n ineffective assistance claim based on trial counsel's failure to object to prosecutorial misconduct hinges on whether the prosecutor's misconduct was plain enough for a minimally competent counsel to have objected." *Stojetz v. Ishee*, 892 F.3d 175, 203 (6th Cir. 2018). For the reasons given above, the evidence at issue was probative, not unfairly prejudicial, and properly admitted. Trial counsel's "failure" to seek its exclusion was not deficient, and, even had an objection been successfully made, there was no probability of a different result: the evidence of Mammone's guilt was beyond any possible doubt.

Mammone also claims that trial counsel should have objected to the admission of his text-message exchanges with his ex-wife immediately before the murders, and to the admission of his ex-wife's calls to 911.

On direct appeal, Mammone argued that this evidence was inadmissible. The Ohio Supreme Court disagreed:

> {¶ 133} Third, Mammone objects to the admission, during the testimony of Marcia and of Richard Hull, of text messages Mammone exchanged with Marcia and Hull on June 7 and 8, 2009. The messages were relevant and admissible because they were indicative of Mammone's intent and conduct throughout the events that occurred on those dates.

> {¶ 134} Finally, Mammone challenges the admission of the audio recordings of Marcia's 9–1–1 calls. These recordings were relevant to establish the nature and circumstances of the crimes and to explain the actions of police officers as the events transpired.

> {¶ 135} None of this evidence was more prejudicial than probative. Nor was it unduly cumulative or repetitive. Instead, this evidence illustrated the testimony of different state witnesses, each of whom contributed to the prosecution's case against Mammone. And because none of this evidence was erroneously admitted,

the prosecution's decision to introduce it did not deprive Mammone of due process or a fair trial.

*Mammone*, *supra*, 139 Ohio St. 3d at 494–95.

The court then rejected Mammone's related ineffective-assistance claim. "As we explained above, we reject Mammone's evidentiary claims and allegations of prosecutorial misconduct. Accordingly, he cannot establish ineffective assistance in this regard." *Id.* at 501.

I agree with the reasons given by the Ohio Supreme Court: the text-message exchanges and 911 calls were extremely probative of Mammone's intent, and there was no plausible basis for excluding them. It was therefore reasonable for the Ohio Supreme Court to hold that trial counsel were not ineffective for failing to exclude this evidence from trial.

### 5. Insanity Defense

Finally, Mammone alleges that trial counsel were ineffective for failing to pursue a defense of not guilty by reason of insanity (NGRI). (Doc. 23, PageID 11272–76).

He claims that trial counsel "should have been aware of [his] prior medical diagnoses" that "supported" an NGRI defense." (*Id.*, PageID 11273). Mammone also contends that counsel "should have been aware that the assessment and ultimate testimony of their chosen expert," forensic psychologist Jeffrey Smalldon, "conflicted with [his] medical records and prior diagnoses." (*Id.*). Accordingly, had counsel pursued this "viable" NGRI defense, Mammone contends that there was a reasonable probability that he would have avoided an aggravated-murder conviction and a death sentence.

### a. Background

Under Ohio law, a defendant is not guilty by reason of insanity if, "at the time of the commission of the offense, [he] did not know, as a result of a severe mental disease or defect, the wrongfulness of [his] acts." O.R.C. § 2901.01(14). An NGRI defense is an affirmative defense,

and the defendant has the burden to prove the defense by a preponderance of the evidence.

O.R.C. § 2901.05(A).

At trial, Dr. Smalldon testified that Mammone was not insane at the time of the murders and therefore did not qualify for an NGRI defense:

Q:      And part of your consultation was also to determine whether there were any issues to be explored regarding his mental status at the time of the offense, correct?

A:      Correct.

Q:      And you did –

A:      Yes.

Q:      -- consider that?

        What did you conclude?

A:      Ah, I concluded that at the time these offenses occurred, Mr. Mammone was experiencing, ah, extreme, ah, emotional distress. Ah, I concluded that at the time of these offenses, ah, he was suffering from a severe mental disorder, that the symptoms associated with that disorder were not so severe that they prevented him from knowing the difference between right and wrong. I believe that he was able to know the difference between right and wrong at the time these offenses were committed.

Q:      So in other words, you found that he was not insane at the time?

A:      Yeah, I didn't think that he would qualify for a defense of not guilty by reason of insanity. That's correct.

Q:      And you have found that in other cases, correct? That, those to be issues?

A:      I have. Not many, but I have.

Q:      Okay.

        On, on the ones where you did not find that, does that mean that the person was not suffering from a serious mental disorder?

A:      No.

Q: So it's possible for someone to have a serious mental disorder and still be considered sane, correct?

A: Definitely. Yes.

(*Id.*, PageID 6046–48).

Nearly eight years after trial, Mammone obtained a second opinion from Dr. Diane Mosnik, a clinical neuropsychologist and forensic psychologist. (Doc. 23–1). Based on her evaluation of Mammone in 2017, Dr. Mosnik opined to a reasonable degree of medical and psychological certainty that, "at the time of the commission of the offenses, as a direct result of his serious mental disease . . . Mr. Mammone III did not know the wrongfulness of his acts." (*Id.*, PageID 11298).

Mosnik's opinion had three key components.

First, she diagnosed Mammone as suffering from "Major Depressive Disorder, recurrent, moderate to severe in severity, with anxious distress and psychotic features" at the time of the murders. (*Id.*). This diagnosis contrasted with that of Dr. Smalldon, who had diagnosed Mammone only with a severe personality disorder (albeit with "a number of characteristics that are very infrequently seen in individuals who are not psychotics" (Doc. 11–6, PageID 6078)) and general anxiety.

Dr. Mosnik took issue with Smalldon's diagnosis, opining that he "neglected to appreciate important information" in Mammone's "history and presentation" that should have clued him into a different diagnosis. (Doc. 23–1, PageID 11298).[5] Mosnik also observed that Smalldon's opinion was inconsistent "with prior clinical diagnoses" that Mammone had a "major mood disorder," not a personality disorder. (*Id.*).

---

[5] Mosnik's report is silent, however, as to what exactly it was in Mammone's history that Smalldon "neglected to appreciate." (Doc. 23–1, PageID 11298). So are Mammone's briefs. (Doc. 23, PageID 11272–75; Doc. 34, PageID 11548–51).

Second, Dr. Mosnik opined that Mammone did not "know the wrongfulness" of his acts "at the time of the crime." (*Id.*). To the contrary, Mosnik explained, the record showed that Mammone "saw no other option for himself other than the one he chose, which he believed to be right and just in his eyes and the eyes of God, which was a direct result of the distortion of his beliefs because of his serious mental disease." (*Id.*, PageID 11298–99).

Third, Dr. Mosnik criticized as non-responsive Smalldon's testimony regarding the NGRI defense. (*Id.*, PageID 11298). Whereas Ohio law asks whether the defendant knows the wrongfulness of his conduct, Mosnik observed that Smalldon had testified only that Mammone knew the difference between right and wrong. (*Id.*).

### b. Procedural Default

"Claims that could have been, but were not, presented to the state courts and that are now barred by state procedural rule are deemed procedurally defaulted." *Franklin v. Bradshaw*, 695 F.3d 439, 449 (6th Cir. 2012). "Default is excused if the petitioner demonstrates: (1) cause for the default and prejudice flowing therefrom; or (2) that failure to consider the claim will result in a fundamental miscarriage of justice." *Id.*

Because Mammone never raised this trial-counsel claim in state court, and because it is now too late to do so, the claim is procedurally defaulted. As I explained in *Mammone III*, *supra*, 2018 WL 454432 at *3, where I denied Mammone's motion for a stay:

> Finally, in claim nineteen, petitioner alleges that trial counsel was ineffective for failing to present a defense that he was not guilty by reason of insanity. According to petitioner, counsel "should have been aware of Mr. Mammone's prior medical diagnoses" supporting that defense.
>
> This claim, like the others at issue, depends on evidence that was available to the defense at trial. For example, petitioner argues that the defense expert, Dr. Smalldon, "neglected to appreciate *important information in Mr. Mammone's history and presentation*, resulting in an inaccurate diagnosis of his condition."

Likewise, petitioner maintains that Smalldon's testimony was generally inconsistent with "*prior clinical diagnoses* given to Mr. Mammone."

Nevertheless, petitioner never raised this claim in state court, and it is too late to do so now. *Spivey*, *supra*, 2017 WL 1113339 at *9–10.

That petitioner has obtained "new" evidence to support this claim – Dr. Mosnik's evaluation, which relies almost entirely on the same evidence available to the defense at trial – does not mean his claim is unexhausted. As the Circuit explained in *Carter v. Mitchell*, 829 F.3d 455, 469 (6th Cir. 2016), "[a]llowing a petitioner periodically to discover (or rediscover) information about himself would frustrate [AEDPA's purpose of achieving finality], and could incentivize capital defendants to deliberately engage in dilatory tactics to prolong their incarceration and avoid execution of the sentence of death."

Relying on *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), Mammone argues that I can excuse his default. Mammone contends that "[t]he systemic failure of the state court process prevented post conviction counsel from litigating [his] case effectively." (Doc. 34, PageID 11548). He also maintains that the state trial court's "refusal to provide funds for a neurologist" meant that postconviction counsel "had no factual basis" to argue that trial counsel were ineffective for not raising the NGRI defense. (*Id.*).

### i. *Martinez* and *Trevino*

In *Martinez*, *supra*, 566 U.S. at 17, the Court held that, where state law "requires" a criminal defendant to raise his ineffective-assistance-of-trial-counsel claim during an initial-review collateral proceeding, a procedural default of the trial-counsel claim during that proceeding will not preclude a federal habeas court from hearing the claim if "there was no counsel or counsel in that proceeding was ineffective." To excuse a default under *Martinez*, the petitioner must also show that the underlying ineffective-assistance claim is "substantial" and that postconviction counsel's failure to raise it was itself ineffective under the *Strickland* framework.

The Court extended the *Martinez* rule in *Trevino*, *supra*, 569 U.S. at 429, holding that it also applies in "situations where state law makes it highly unlikely that a defendant will have a meaningful opportunity to raise ineffective-assistance claims on direct appeal."

"*Martinez* currently applies only to States that deliberately choose to channel claims of ineffective assistance of trial counsel into collateral proceedings," *Davila v. Davis*, --- U.S. ---, 137 S. Ct. 2058, 2068 (2017), and the Sixth Circuit "has concluded that *Martinez* does not apply in Ohio because Ohio permits ineffective-assistance-of-counsel claims on direct appeal." *Henness v. Bagley*, 766 F.3d 550, 557 (6th Cir. 2014). The Sixth Circuit has not decided, however, whether *Trevino* applies to Ohio cases. *McGuire v. Warden, Chillicothe Corr. Inst.*, 738 F.3d 741, 750–52 (6th Cir. 2013); *see also id.* at 582 (suggesting that *Trevino*'s application to Ohio cases "is neither obvious nor inevitable").

### ii. The Default Is Not Excusable

Given the lack of guidance from the Sixth Circuit and the difficulty of the question, I will simply assume, *arguendo*, that *Trevino* applies here. The assumption does Mammone no good, however, because he has not shown that postconviction counsel was ineffective for failing to argue that trial counsel should have pursued the NGRI defense.

First, Mammone takes the position that postconviction counsel "could not raise this specific issue as they had no factual basis for it." (Doc. 34, PageID 11548). This was the case, according to Mammone, because the state trial court "refused to provide funds for a neurologist," thus depriving postconviction counsel "of the necessary tools" to litigate this claim. (*Id.*). But if there were no factual basis for the claim, postconviction counsel could not have been ineffective for failing to raise it.

Second, Mammone's emphasis on the state trial court's denial of funds to retain a neuropsychologist suggests that he is not making a true *Martinez/Trevino* argument. Rather, the argument sounds in the more conventional basis for excusing a procedural default where "some objective factor external to the defense" – here, the denial of needed funds to retain an expert and develop the claim – "impeded counsel's efforts" to raise the claim. *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

Such an argument would lack merit, however, given that the basis of the claim was trial counsel's alleged failure to appreciate: 1) the alleged discrepancy between Dr. Smalldon's diagnosis and Mammone's earlier diagnoses that allegedly supported an NGRI defense; and 2) Smalldon's alleged misunderstanding of the criteria for an NGRI defense. These discrepancies were apparent from the face of the trial record, such that postconviction counsel was in a position to marshal them into a claim of ineffective assistance for not pursuing the NGRI defense.

Furthermore, while postconviction counsel lacked the assistance of a neuropsychologist, counsel did have the assistance of a second forensic psychologist, Dr. Bob Stinson, in preparing Mammone's postconviction petition. (Doc. 10–22, PageID 2186–94). With such expert assistance at the ready, the trial court's denial of funds for a neuropsychologist did not prevent postconviction counsel from raising the claim.

Third, as I explain below, the claim that trial counsel were ineffective for failing to raise an NGRI defense has no merit. Postconviction counsel's failure to raise this claim was not deficient, nor was there a reasonable probability of a different outcome to Mammone's collateral attack if counsel had raised the claim.

For these reasons, I cannot excuse Mammone's procedural default.

### c. Merits

Even assuming that I could excuse Mammone's default, habeas relief is unavailable because Mammone has not shown that trial counsel's failure to raise an NGRI defense was deficient under a de novo standard of review.

### i. Trial Counsel Considered the NGRI Defense

First, there is no evidence in the record tending to show that trial counsel failed to consider, overlooked, or simply ignored the possibility of an NGRI defense. Indeed, the record establishes just the opposite.

Trial counsel retained an expert – Dr. Smalldon – who explored that very issue (and many others) but concluded that Mammone did not "qualify for a defense of not guilty by reason of insanity." (Doc. 11–6, PageID 6047). Smalldon based this opinion on his comprehensive review of Mammone's background and twenty hours of meeting with Mammone over seven different occasions. (*Id.*, PageID 6049). There is no question, moreover, that Smalldon was qualified for his task, having worked on "about 250" capital cases during his twenty-year career. (*Id.*, PageID 6061).

Mammone's counsel, who are entitled to a "strong presumption of competence," *Pinholster*, *supra*, 563 U.S. at 196, were presumably familiar with the NGRI defense, and they would have certainly consulted with Dr. Smalldon about his conclusions before putting him on the stand. (Doc. 11–6, PageID 6044–45) (Smalldon testifying that he met with defense counsel before trial). Had counsel learned from Smalldon that there was a valid and viable basis for pursuing an NGRI defense, they presumably would have followed that path and raised the issue at trial. *Pinholster*, *supra*, 563 U.S. at 196 (courts applying *Strickland*'s performance prong must "affirmatively entertain the range of possible reasons [the petitioner's] counsel may have had for

proceeding as they did"). Yet they proceeded apace with Dr. Smalldon, who testified repeatedly that his evaluation foreclosed an insanity plea. (*Id.*, PageID 6046–48, 6068, 6104).

The record therefore excludes the possibility that counsel did not consider or investigate an NGRI defense.

### ii. Counsel Reasonably Decided to Forgo the NGRI Defense

As just seen, trial counsel conducted a reasonable investigation into the possibility of an NGRI defense, but Dr. Smalldon's opinion that Mammone was not insane precluded the defense from raising that issue. (Doc. 11–6, PageID 6068 (Smalldon testifying that Mammone "know[s] that those acts [*i.e.*, the murders] were wrong in the eyes of the law"); (*id.*, PageID 6104) (Smalldon testifying that Mammone knew his "conduct on this night [*i.e.*, the night of the murders] was criminal")).

"Counsel's decision not to pursue an insanity defense must be understood as a strategic one, absent any compelling evidence to the contrary." *Lundgren*, *supra*, 440 F.3d at 772.

Mammone contends that such "compelling evidence" exists in the form of Dr. Smalldon's alleged shortcomings in performing his evaluation – specifically, his alleged misdiagnosis of a personality disorder (rather than major depressive disorder) and failure to appreciate "important information" in Mammone's "history and presentation." (Doc. 23–1, PageID 11298).

Mammone's argument – and Dr. Mosnik's critique of Smalldon's opinion as to the viability of the NGRI defense – also depend on Smalldon's testimony that Mammone was not insane because "he was able to know the difference between right and wrong at the time these offenses were committed." (Doc. 11–6, PageID 6047). The unstated premise of their position seems to be that Dr. Smalldon must have ruled out this defense, at least in part, because he

mistakenly believed that Mammone could not be legally insane if he knew the difference between right and wrong.

These contentions lack merit and are insufficient to overcome the "strong presumption" that counsel performed reasonably by relying on Dr. Smalldon and forgoing an NGRI defense. *Pinholster*, *supra*, 563 U.S. at 196.

### (a). Consistency of Diagnoses

According to Dr. Mosnik's evaluation of Mammone:

1. Mammone participated in outpatient psychotherapy from April 2, 2007 through December 17, 2007. His care provider diagnosed him with Generalized Anxiety Disorder (Doc. 23–1, PageID 11286), which Smalldon also diagnosed. (Doc. 11–6, PageID 6100).

2. Mammone participated in psychotherapy with Dennis Ward and Cynthia Rudick from April, 2007 to April, 2008. (Doc. 23–1, PageID 11286).

3. Mammone's primary care doctor diagnosed him in September, 2007 with depression. (*Id.*).

4. Mammone received psychotherapeutic treatment from Carolyn Buck, a licensed professional clinical counselor, from July, 2008 through January, 2009. She diagnosed him with "Major Depression. (*Id.*).

Dr. Smalldon testified that he reviewed Mammone's medical records and interviewed Dr. Ward and Ms. Buck. (Doc. 11–6, PageID 6050–51, 6081–82). Asked by defense counsel whether his diagnosis of Mammone – a severe personality disorder with schizotypal, borderline, and narcissistic features, with passive-aggressive and obsessive-compulsive traits, and

generalized anxiety disorder – was consistent with "what you've learned from his prior treaters,"

Dr. Smalldon said that it was:

> A:    Yes. In fact, the generalized anxiety disorder which I said was by history, ah, that was the diagnosis that was, ah, given to Mr. Mammone by Dr. Dennis Ward, ah, who saw him towards the end of 2007.
>
> *    *    *
>
> Q:    Okay. Your diagnosis was consistent, however, correct?
>
> A:    Yes.

(Doc. 11–6, PageID 6081–82).

Dr. Smalldon elaborated on this point during cross-examination, when the prosecutor asked whether Smalldon was the only treatment provider to diagnose personality disorder. Smalldon acknowledged that he was the only such provider, but he explained that short-term care providers ordinarily do not make personality-disorder diagnoses:

> Q:    And none of those other folks diagnosed him with the, with the personality disorder not otherwise specified, correct?
>
> A:    No.
>
> Q:    Okay. So you're the only one that made that diagnosis?
>
> A:    Ah, a qualified, yes. I mean, ah, that, wasn't, ah, their – typically short term therapists wouldn't make a personality disorder diagnosis like that. But, no, to the best of my knowledge. Though they certainly described characteristics of him that were consistent with that diagnosis.

(*Id.*, PageID 6100).

This exchange, as well as Dr. Smalldon's testimony as a whole, established that the doctor had an explanation for why his diagnosis differed from that of Mammone's earlier treatment providers. While acknowledging the difference, moreover, Smalldon emphasized that the prior treatment providers "described characteristics" of Mammone's personality that were

62

consistent with his own diagnosis. (*Id.*). Nothing in Mosnik's report or Mammone's briefs calls

that explanation into question, just as nothing there suggests that trial counsel should have

recognized that Smalldon's explanation was problematic.

With no evidence "to support the conclusion that [Mammone's] trial counsel *should have

been aware at the time of [his] trial* (including the penalty phase) that any further investigation

into" his prior diagnoses "would have produced more evidence" to support an NGRI defense

beyond that already" found lacking by Dr. Smalldon, Mammone's claim fails. *Black v. Bell*, 664

F.3d 81, 105 (6th Cir. 2011) (emphasis in original). Mammone's "trial-level counsel [were]

entitled to rely on the conclusions arrived at by" Dr. Smalldon "after [his] examination of

[Mammone]. Dr. [Smalldon] appears to have conducted himself in a professional and efficient

manner, and [Mammone] makes no persuasive argument to the contrary." *McGuire*, *supra*, 738

F.3d at 758.

One final point is worth making.

Although Dr. Mosnik criticizes Smalldon for not diagnosing major depressive disorder,

she ignores the fact that a second expert – Bob Stinson, a forensic psychologist who prepared a

report in support of Mammone's postconviction petition – likewise diagnosed Mammone with a

severe personality disorder. (Doc. 10–22, PageID 2186, 2192).

The defense retained Dr. Stinson to opine whether "there were mitigating factors that

were not offered at trial . . . that would have been relevant, important, and helpful to the jury for

mitigation purposes." (*Id.*, PageID 2188). After reviewing all of Mammone's medical records

and interviewing Mammone in person, Stinson "agree[d] with" Smalldon's findings that

Mammone suffered from "Personality Disorder Not Otherwise Specified with Schizotypal,

Borderline, and Narcissistic Features," and that this disorder "was a severe one." (*Id.*, PageID 2192).

All this tends to show that, even if counsel had a basis to question the validity of Dr. Smalldon's diagnosis (and Mammone has not established that they did), there was no guarantee that another mental-health expert would have diagnosed Mammone with major depressive disorder and excluded a personality-disorder diagnosis. Nor were counsel sure to get an explanation of how the alleged depressive disorder supported an NGRI defense.

"Absent a showing that trial counsel reasonably believed that Dr. [Smalldon] was somehow incompetent or that additional testing should have occurred" – a showing, I reiterate, that Mammone has not come close to making – "simply introducing the contrary opinion of another mental health expert" like Dr. Mosnik "during habeas review is not sufficient to demonstrate the ineffectiveness of trial counsel." *McGuire*, *supra*, 738 F.3d at 758.

### (b). Dr. Smalldon's Understanding of an NGRI Defense

Dr. Mosnik opined that Mammone was insane at the time of the crimes because, "as a direct result of his serious mental disease," he "did not know the wrongfulness of his acts." (Doc. 23–1, PageID 11298). She took issue with Dr. Smalldon's opinion that an NGRI plea was not viable because Smalldon, in her view, failed to address that question. (*Id.*). Rather, Dr. Smalldon testified that Mammone was not insane because he "knew the difference between right and wrong," not that he knew the wrongfulness of his acts. (*Id.*).

Ohio case law confirms that Dr. Smalldon correctly understood the criteria for an NGRI defense.

As the Ohio courts have explained, "[t]he test of legal sanity is whether the defendant is able to recognize the difference between right and wrong in respect to a crime of which he was

charged and is able to choose right and abjure wrong." *State v. Bailey*, 2010-Ohio-6155, ¶40 (Ohio App. 2010). The critical question is whether the defendant knows that his actions are "against the law." *State v. Carreiro*, 988 N.E.2d 21, 27 (Ohio App. 2013) ("a defendant who knows his actions are against the law . . . understands the 'wrongfulness' of his actions under R.C. 2901.01(A)(14)).

It is therefore common to find Ohio cases that discuss the defendant's ability (just as Dr. Smalldon commented on Mammone's ability) to "appreciate the difference between right and wrong" as one basis for rejecting an NGRI defense. *E.g.*, *State v. Davenport*, 2018-Ohio-2933, ¶30 (Ohio App. 2018) (evidence that defendant "suffered mental health problems" did "not show that [he] was unable to understand the difference between right and wrong"); *State v. Muhammed*, 2008-Ohio-2839, ¶22 (Ohio App. 2008) ("At no time in his testimony did [the defendant] claim that he was so mentally ill that he did not know the difference between right and wrong[.]"); *see also Bobby v. Bies*, 556 U.S. 825, 829–30 (2009) (recounting evidence that defendant in Ohio capital-murder case "did not qualify for a plea of not guilty by reason of insanity . . . because he knew the difference between right and wrong at the time of the offense").

For all these reasons, trial counsel performed reasonably by forgoing an NGRI defense. Because Mammone cannot satisfy the performance prong, I need not consider the subject of prejudice.

### E. Juror Misconduct During Penalty-Phase Deliberations

In his sixth ground for relief, Mammone alleges that one of the jurors violated the trial court's instructions by refusing to consider the defense's mitigation evidence and discussing the case with a family member. (Doc. 23, PageID 11195–97).

To support this claim, Mammone relies on the affidavit, discussed above, that the public defender's investigator prepared in May, 2011. According to the affidavit, Juror 438 told the investigator that he "did not consider Dr. Jeffrey Smalldon's testimony because James Mammone, III was not crazy." (Doc. 10–22, PageID 2211).

Mammone also argues that Juror 438 "may have violated the trial court's instructions by discussing the case with a family member." (Doc. 23, PageID 11197). Here Mammone relies on several comments that an anonymous poster made in the comments section of the *Canton Repository*'s website. The gist of the posts was that the commenter had "a close family member on the jury," and that the juror's service "is tearing him up." (*Id.*, PageID 11197–98). Mammone contends that the anonymous poster, who identified herself only as a secretary working in the legal field, was Juror 438's daughter. (*Id.*).

### 1. State Courts' Decisions

Mammone raised this claim in his postconviction petition, and the trial court rejected the claim for three reasons. (Doc. 22, PageID 2434).

First, the court held that "neither the evidence dehors the record nor the record itself supports Mammone's contention that juror 438 failed to consider aggravating and mitigating circumstances or that juror 438's decision was tainted by outside influence." (*Id.*). Second, the court ruled that the investigator's affidavit was "inadmissible hearsay" under Ohio Evid. R. 606(b). (*Id.*). Third, the court found that Mammone offered nothing but "pure speculation" to support his claim that Juror 438 had improper out-of-court communications. (*Id.*).

On postconviction appeal, the Ohio Court of Appeals affirmed the lower court's finding that the affidavit was not admissible to impeach the jury's verdict:

{ ¶ 22}  Appellant's third * * * ground[ ] for relief challenged activity that occurred during jury deliberations regarding Juror No. 438 * * *. In support of his

arguments, appellant submitted as Exhibit B the hearsay affidavit of a criminal investigator for the State Public Defender's Office, Felicia Crawford.

{¶ 23} Evid.R. 606 governs competency of juror as witness. Subsection (B) states the following:

{¶ 24} "(B) Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. A juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear on any juror, only after some outside evidence of that act or event has been presented. However a juror may testify without the presentation of any outside evidence concerning any threat, any bribe, any attempted threat or bribe, or any improprieties of any officer of the court. A juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying will not be received for these purposes."

{¶ 25} The affidavit of Ms. Crawford is a flagrant attempt to bypass the aliunde rule adopted by the Ohio legislature in Evid.R. 606(B). *State v. Jones* (December 29, 2000), Hamilton App. No. C–990813. The trial court was correct in disregarding the affidavit.

{¶ 26} We find the trial court did not err in denying appellant's third * * * ground[ ] for relief.

*Mammone*, *supra*, 2012 WL 3200685 at *3 (internal ellipses and brackets supplied).

## 2. Analysis

"There is nothing in clearly established Supreme Court law requiring states to take cognizance of evidence excludable under such common evidentiary rules" like Ohio's Evidence Rule 606(b). *Matthews v. Workman*, 577 F.3d 1175, 1182 (10th Cir. 2009) (Gorsuch, J.).

On the contrary, the "firmly-established common law rule in the United States flatly prohibit[s] the admission of juror testimony to impeach a jury verdict." *Tanner v. v. U.S.*, 483 U.S. 107, 116 (1987). Courts do not "call[ ] . . . verdict[s] into question by reviewing the private,

internal deliberations of the jury." *Doan v. Brigano*, 237 F.3d 722, 733 (6th Cir. 2001), *overruled on other grounds by Wiggins v. Smith*, 539 U.S. 510 (2003).

"Exceptions to the common-law rule [are] recognized only in situations in which an 'extraneous influence' [is] alleged to have affected the jury." *Tanner*, *supra*, 483 U.S. at 116 (quoting *Mattox v. U.S.*, 146 U.S. 140, 149 (1892)).

"Whether the jury understood the evidence presented at trial or the trial judge's instructions following the presentation of evidence, whether a juror was pressured into arriving at a particular conclusion, and even whether jurors were intoxicated during deliberations, are all internal matters for which juror testimony may not be used to challenge a final verdict." *Doan*, *supra*, 237 F.3d at 733 (citing *Tanner*, *supra*, 483 U.S. at 117–22).

Because Juror 438's statement to the investigator – that he did not consider Dr. Smalldon's testimony – concerned "an internal influence on the jury's verdict," Mammone may not use the affidavit to impeach the jury's verdict. *Djoumessi v. Wolfenbarger*, 2007 WL 2021837, *5 (E.D. Mich. 2007); *accord Hoffner v. Bradshaw*, 622 F.3d 487, 501 (6th Cir. 2010) (Ohio court properly excluded juror's affidavit stating that petitioner's lack of emotion was a factor in sentencing petitioner to death because the affidavit did "not allege that the jury was influenced by any 'extraneous' information").

Furthermore, there was no evidence before the Ohio courts – just as there is none before me – showing or even suggesting that Juror 438 discussed the case with a family member. Given the entirely speculative nature of Mammone's "evidence" on this score, the state courts acted reasonably in rejecting this component of the claim.

**F. Juror Prayer Before Penalty-Phase Deliberations**

Mammone's seventh ground for relief alleges that the jurors' decision to pray before beginning their penalty-phase deliberations violated his right to a fair trial. (Doc. 23, PageID 11200–02).

According to the affidavit of the public defender's investigator, four jurors acknowledged that "the jurors said a prayer prior to starting deliberations at the penalty phase. One juror asked if a prayer could be said and all jurors agreed to saying a prayer." (Doc. 10–22, PageID 2212). Relying on this evidence, Mammone argues that "the jury failed to consider the factors that [they] were specifically directed to consider" by the trial court and instead "attempt[ed] to apply God's perceived will" to the facts of the case. (Doc. 34, PageID 11492).

Mammone raised this claim during state collateral review, but the Ohio Court of Appeals rejected it. The court refused to consider the affidavit under Ohio Evid. R. 606(B) and concluded that Mammone was improperly attempting to impeach the jury's verdict. *Mammone II*, *supra*, 2012 WL 3200685 at *4.

The state court's decision was reasonable.

Due process requires that a criminal defendant be tried by a "jury capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). A juror's consideration of extraneous evidence violates the defendant's right to a jury trial. *Turner v. Louisiana*, 379 U.S. 466, 471–73 (1965)

While these rules are clearly established, no Supreme Court law forbids jurors to pray during deliberations or holds that such a prayer amounts to an improper "extraneous influence" on those deliberations.

Furthermore, the parties have not cited any relevant cases on this issue, but the decisions that I reviewed all rejected claims that juror prayers during deliberations are external influences or violate a defendant's jury-trial right. *E.g.*, *State v. DeMille*, 756 P.2d 81, 84 (Utah 1988) ("prayer and supposed responses to prayer are not included within the meaning of the words 'outside influence'"); *State v. Setzer*, 36 P.3d 477, 480 (Idaho 2001) (rejecting defendant's claim that "the prayer with which the jury began its deliberations" was an "outside religious influence"); *State v. Renner*, 1994 WL 501778, *8–9 (Tenn. App. 1994) (affidavits describing jurors praying during deliberations were inadmissible because "they demonstrate part of the internal, mental processes used by the jury in reaching its verdict"); *Lewis v. Davis*, 2018 WL 4024811, *23 (E.D. Cal. 2018) (statements by foreperson who began deliberations with a prayer "reasonably could be seen to reflect his personal religious and deliberative process rather than extrinsic information forbidden to jurors"); *Alkebulanyahh v. Byars*, 2015 WL 2381353, *27 (D.S.C. 2015) ("prayers offered by jurors with no external involvement would seem – perhaps even more so than the Bible – to invite inner examination of oneself").

In the absence of controlling Supreme Court authority, and given the view of state and federal courts that prayer does not amount to an extraneous influence, section 2254(d) forecloses habeas relief.

### G. Execution of the "Severely Mentally Ill"

In his eighth ground for relief, Mammone argues that executing him would amount to cruel and unusual punishment because he has "a serious severe mental illness." (Doc. 23, PageID 11203). Because this illness "renders him no more culpable for his crime that a juvenile or an intellectually disabled person" – and because the Eighth Amendment forbids the executions of such persons – Mammone argues that his death sentence is invalid. (*Id.*).

Mammone raised this claim on direct appeal, but the Ohio Supreme Court rejected it on

two grounds. After first holding that the Eighth Amendment does not categorically exempt the

"seriously mental ill" from execution, the court held that Mammone did not suffer from a

"serious mental illness":

{ ¶ 175}  In his eighth proposition of law, Mammone argues that his death
sentence violates the Eighth and Fourteenth Amendments because he is "seriously
mentally ill." We reject this claim because the Eighth Amendment does not bar
the execution of the seriously mentally ill and, in any event, Mammone has not
shown that he suffers from a "serious mental illness."

{ ¶ 176}  As interpreted by the United States Supreme Court, the Eighth
Amendment's prohibition on "cruel and unusual punishments" requires that the
"punishment for crime * * * be graduated and proportioned to [the] offense."
*Weems v. United States*, 217 U.S. 349, 367, 30 S.Ct. 544, 54 L.Ed. 793 (1910). As
"the most severe punishment," the death penalty is "reserved for a narrow
category of crimes and offenders." *Roper v. Simmons*, 543 U.S. 551, 568, 569,
125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). Accordingly, the United States Supreme
Court has identified three categories of offenders who cannot be sentenced to
death consistent with the Eighth Amendment: juveniles, the insane, and the
mentally retarded. *Id.* at 578, 125 S.Ct. 1183, (abrogating *Stanford v. Kentucky*,
492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989)); *Ford v. Wainwright*, 477
U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986); *Atkins v. Virginia*, 536 U.S.
304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (abrogating *Penry v. Lynaugh*, 492
U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989)).

{ ¶ 177}  Mammone does not (and does not claim to) fit any of these categories.
Instead, he urges this court to extend the Eighth Amendment's protections to a
fourth category of offenders: defendants with severe mental illness. Mammone in
effect argues that the Eighth Amendment protections can change over time
because the amendment "draw[s] its meaning from the evolving standards of
decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S.
86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (Warren, C.J., plurality opinion). In
light of present "standards of decency," Mammone would have us hold that the
Eighth Amendment bars capital punishment for offenders with serious mental
problems.

{ ¶ 178}  Mammone cites two concurring opinions in support of his argument.
*State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 343–367
(Lundberg Stratton, J., concurring); *State v. Ketterer*, 111 Ohio St.3d 70, 2006-
Ohio-5283, 855 N.E.2d 48, ¶ 210–250 (Lundberg Stratton, J., concurring). But
these opinions do not support Mammone's claim of an Eighth Amendment
violation. Instead, they speak to policy matters. Justice Lundberg Stratton did not

interpret the Eighth Amendment to bar the execution of the severely mentally ill. She noted that "'mental illnesses vary widely in severity'" and that "'[t]he General Assembly would be the proper body to * * * take public testimony, hear from experts in the field, and fashion criteria for the judicial system to apply.'" *Lang* at ¶ 365 (Lundberg Stratton, J., concurring), quoting *Ketterer* at ¶ 248 (Lundberg Stratton, J., concurring).

{¶ 179} Neither the United States Supreme Court nor any other court has ever recognized the seriously mentally ill as a category of offenders who cannot be constitutionally executed. See *State v. Dunlap*, 155 Idaho 345, 380, 313 P.3d 1 (2013) ("It appears that every court that has considered this issue [has] refused to extend Atkins and hold that the Eighth Amendment categorically prohibits execution of the mentally ill"). Likewise, we have repeatedly rejected claims that executing a severely mentally ill person constitutes cruel and unusual punishment. See, e.g., *Ketterer* at ¶ 176; *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 155 ("We have found no court that has held that it violates the Eighth Amendment to impose a death sentence on a defendant who was severely mentally ill at the time of the offense" [footnote omitted] ).

{¶ 180} In addition, there is tremendous variation in the types and degrees of mental illness. *See Hancock* at ¶ 157 ("Mental illnesses come in many forms; different illnesses may affect a defendant's moral responsibility or deterrability in different ways and to different degrees"). It is therefore fitting that Ohio's sentencing statutes permit consideration of mental illness on a case-by-case basis. Evidence of mental illness is relevant during sentencing under R.C. 2929.04(B)(3) and (B)(7), thereby allowing for "the individualized balanc[ing] between aggravation and mitigation in a specific case." *Id.* at ¶ 158. Here, defense counsel presented evidence about Mammone's mental illness in mitigation, and the jury and trial court weighed that information when determining his sentence. We will again weigh that evidence during our independent sentence evaluation.

{¶ 181} Even if we had some inclination to interpret the Eighth Amendment more broadly, we are unconvinced that Mammone has a "serious mental illness." Dr. Smalldon testified that Mammone has a personality disorder (not otherwise specified) with schizotypal, borderline, and narcissistic features. He further stated that Mammone also has passive-aggressive and compulsive personality traits, as well as some traits that are commonly associated with psychotics. Regardless of how "serious mental illness" is defined, Mammone's mental problems are less severe than those of defendants in other cases in which we have rejected Eighth Amendment challenges. *See, e.g., Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, at ¶ 211 (Lundberg Stratton, J., concurring) (noting that the state did not contest the defendant's serious mental illness, including bipolar disorder, substance-abuse problems, and multiple past suicide attempts); *State v. Scott*, 92 Ohio St.3d 1, 2, 748 N.E.2d 11 (2001) (rejecting Eighth Amendment challenge to execution of "any person with a biologically based severe mental illness such as schizophrenia").

{ ¶ 182}  For all these reasons, we reject proposition of law VIII.

*Mammone*, *supra*, 139 Ohio St. 3d at 504–06.

This decision was neither contrary to, nor an unreasonable application of, Supreme Court precedent.

The Supreme Court has never held that the Eighth Amendment forbids the execution of the "seriously mentally ill," and "[i]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by" the Supreme Court." *Harrington*, *supra*, 562 U.S. at 101; *see also Carey v. Musladin*, 549 U.S. 70, 77 (2006).

For these reasons, "extending the holding of *Atkins* to exempt the mentally ill, or even just the seriously mentally ill, from executions exceeds the limited elasticity of the AEDPA and the Court's relevant holdings." *Franklin v. Bradshaw*, 2009 WL 649581, *74 (S.D. Ohio 2009), *aff'd on other grounds by Franklin v. Bradshaw*, 695 F.3d 439 (6th Cir. 2012). Habeas relief is thus unavailable.

### H. Ineffective Assistance of Trial Counsel – Penalty Phase

In his ninth, fourteenth, and fifteenth grounds for relief, Mammone argues that trial counsel were ineffective at the penalty phase.

### 1. Failure to Retain a Neuropsychologist

### a. Background

According to Mammone, counsel were ineffective for not obtaining a neuropsychologist to evaluate him. (Doc. 23, PageID 11209–16).

While recognizing that counsel had the assistance of Dr. Smalldon, Mammone contends that Smalldon failed to "uncover any information pointing to the presence of a brain disorder"

despite "numerous indicators of brain deficits in [Mammone's] history and prior evaluations[.]" (*Id.*, PageID 11210).

During state postconviction review, Mammone emphasizes, forensic psychologist Bob Stinson evaluated Mammone and opined, contrary to Dr. Smalldon, that "there are indications of neurological, neurophysiological, and/or neuropsychological deficits in James Mammone." (*Id.*, PageID 11211). This signaled a need for further neuropsychological testing, Stinson believed, which could have led to the discovery of mitigating evidence. (*Id.*, PageID 11211–12).

To illustrate the kind of evidence such testing could have produced, Mammone relies on the "[r]esults of neuropsychological testing recently conducted" by Dr. Mosnik in 2017. (*Id.*, PageID 11212). According to her report, Mammone: 1) cannot "accurately discriminate people's emotions" or "make inferences and interpret perspectives about behavior in social situations"; 2) consistently had "episodes of major depression and anxiety" and "delusional" thoughts; 3) meets "the criteria for a clinical diagnosis of Major Depressive Disorder, recurrent, moderate to severe in severity over time, with anxious distress and psychotic features"; and 4) "exhibits certain characteristics that would be consistent with a diagnosis of Bipolar disorder (*id.*, PageID 11212–13).

Had the jury heard this evidence, Mammone concludes, there was a reasonable probability that they would have spared his life.

### b. State Courts' Decisions

The Ohio Court of Appeals rejected this claim on postconviction appeal:

{ ¶ 13}  First, appellant argued his trial counsel was ineffective for failing to obtain all necessary experts specifically, a neuropsychologist to evaluate him, and failed to request neuroimaging. Appellant argues the trial court did not properly consider these claims.

{¶ 14} The record establishes on August 17, 2009, the trial court appointed the testifying forensic psychologist, Jeffrey Smalldon, Ph.D., as specifically requested by appellant on June 23, 2009.

{¶ 15} In his petition, appellant attached as Exhibit A the affidavit of a board certified forensic psychologist, Bob Stinson, Psy.D., J.D., ABPP, who opined at ¶ 17, "I strongly recommend that James Mammone be evaluated by specialists in the field of neurology, neurophysiology, and neuropsychology to determine the existence of brain dysfunction, neurological insults, and/or neuropsychological deficits." Dr. Stinson at ¶ 15 noted Dr. Smalldon was not a neuropsychologist. In fact, Dr. Smalldon is a forensic psychologist as is Dr. Stinson.

{¶ 16} Dr. Smalldon testified he has conducted neuropsychological assessments requested by neurologists, neurosurgeons, and other specialists to determine "whether some of their patients may have deficits that haven't maybe turned up on MRIs and cat scans, but that may show up in neuropsychological testing." Sentencing Phase Vol. II T. at 367–368.

{¶ 17} Dr. Smalldon testified he met with appellant seven times with twenty hours of face-to-face time. *Id.* at 376. His evaluation included numerous tests given to appellant as well as a "review of a very extensive collection of case relevant background records" and third-party interviews. *Id.* at 377, 400–401. Dr. Smalldon found no indication of any brain disorder, despite appellant's medical history of a bicycle accident wherein he may have lost consciousness. *Id.* at 401. He also opined appellant was not actively psychotic, but his profile did include characteristics of those who are psychotic. *Id.* at 405, 406. Dr. Smalldon found appellant to have a severe personality disorder not otherwise specified with schizotypl [*sic*], borderline, and narcissistic features. *Id.* at 408, 416–419. Appellant also exhibited the "presence of both passive aggressive and obsessive compulsive personality traits" and "generalized anxiety disorder" by history. *Id.* at 408, 420–421. None of the testing indicated any brain damage. *Id.* at 426.

{¶ 18} In his affidavit, Dr. Stinson, who possesses the same credentials as Dr. Smalldon, advanced the opposite opinion. We fail to see that the presence of a contradicting opinion by one who never interviewed appellant would result in any affirmative help to appellant's case. The affidavit is only an offer of a contradicting opinion and not definitive evidence on the issue.

{¶ 19} We find the trial court did not err in rejecting Dr. Stinson's affidavit and denying appellant's first ground for relief.

*Mammone II*, *supra*, 2012 WL 3200685 at *2–3.[6]

---

[6] Contrary to the state appellate court's decision, Dr. Stinson did interview Mammone in person before preparing his opinion. (Doc. 10–22, PageID 2189).

### c. Analysis

"In assessing whether a defendant's counsel was ineffective at the mitigation hearing for failing to introduce evidence, the focus must be on whether the investigation supporting counsel's decision not to introduce mitigating evidence of the defendant's background was itself reasonable." *Clark v. Mitchell*, 425 F.3d 270, 284 (6th Cir. 2005).

Here the record establishes that trial counsel investigated and presented mitigating evidence relating primarily to Mammone's mental health and abusive family background. To aid these efforts, counsel retained a psychologist who, though not himself a neuropsychologist, performed neuropsychological screening tests on Mammone and concluded that there was no evidence that Mammone had a brain impairment. (Doc. 11–6, Page ID, 6070–74). Smalldon testified, moreover, that the accounts of Mammone sustaining a head injury as a teenager (either from falling off a bicycle or as a result of being hit by a car while riding his bike) had prompted him to screen for brain damage. (*Id.*, PageID 6074).

Dr. Smalldon examined Mammone at great length, meeting with him seven times for a total of twenty hours. (*Id.*, PageID 6049). As discussed above, Smalldon was experienced with capital cases, having worked on "about 250" of them. (*Id.*, PageID 6061). He had even performed "neuropsychological assessments" at the request of "neurologists, neurosurgeons, [and] other specialists" in cases where "there are questions about whether some of their patients may have deficits that haven't maybe turned up on MRIs and cat scans[.]" (*Id.*, PageID 6040–41).

What's more, there is no evidence in the record – nor even any allegations – that trial counsel simply ignored the issue.

To the contrary, that Smalldon screened Mammone for brain damage suggests that the issue of possible neurological deficits was something that the defense focused on. Smalldon was, moreover, competent for this task, having handled neurological consults before. And with Mammone having failed to identify any basis in the record for doubting Smalldon's competence, I must presume that it was reasonable for trial counsel to rely on his expertise. *Lundgren*, *supra*, 440 F.3d at 772 ("A licensed practitioner is generally held to be competent, unless counsel has good reason to believe to the contrary.").

As in *Clark*, *supra*, 425 F.3d at 285, here it was "not unreasonable for [Mammone's] counsel, untrained in the field of mental health, to rely on" Dr. Smalldon's opinion that Mammone showed no signs of neurological damage. *Accord Campbell v. Coyle*, 260 F.3d 531, 555–56 (6th Cir. 2001) (rejecting claim that trial counsel was ineffective for not retaining expert in post-traumatic stress disorder where defense psychologist who examined petitioner detected no evidence that petitioner suffered from PTSD); *Sneed v. Johnson*, 2007 WL 709778, *62 (N.D. Ohio 2007) (Gaughan, J.) ("the Sixth Circuit has held that counsel cannot be ineffective for failing to procure a neuropsychologist when a retained psychologist failed to find a mental ailment").

Furthermore, the state appellate court could have reasonably concluded that Mammone suffered no prejudice.

Dr. Stinson's affidavit did not opine that Mammone in fact had a brain impairment. (Doc. 10–22, PageID 2186–94). He concluded only that there were indications that "Mammone may suffer from neurological, neurophysiological, and/or neuropsychological deficits." (Doc. 10–22, PageID 2194). That does not suffice to clear *Strickland*'s – and § 2254(d)'s – high bars. *Carter*, *supra*, 443 F.3d at 529 (petitioner "wholly failed to show any error relating to trial

counsel's decision not to hire a neuropsychologist" where a neuropsychologist retained during

state postconviction review "stated only that there is a 'likelihood' that [petitioner] has 'some

kind of brain related difficulty'"); *accord McGuire*, *supra*, 738 F.3d at 758 (rejecting similar

claim where new expert's report "suggest[ed] only the possibility of organic brain tissue damage

without corroboration").

Finally, I have not considered – indeed, cannot consider – Dr. Mosnik's evaluation of

Mammone because that evidence was not before the state court that adjudicated this *Strickland*

claim. *Pinholster*, *supra*, 563 U.S. at 181.

For these reasons, habeas relief is unavailable on Mammone's ninth ground.

## 2. Autism Spectrum Disorder

Mammone next alleges that trial counsel were ineffective for not presenting evidence that

he suffers from Autism-Spectrum Disorder. (Doc. 23, PageID 11231–32).

According to Mammone, such evidence "would have provided the jury with context for

Mr. Mammone's rigid demeanor throughout trial" and especially his "5-hour unsworn statement

during which he repeatedly showed little emotion." (*Id.*). Because trial counsel failed to present

such evidence, Mammone argues that the jury had no "context within which to interpret Mr.

Mammone's unsworn statement," such that his "detailed, cold and detached narrative was

therefore likely disturbing to jurors." (*Id.*).

### a. Procedural Default

Mammone is not entitled to habeas relief on this claim because it is procedurally

defaulted. As I held in a prior order:

> Although petitioner did not raise this claim either on direct appeal, *State v.*
> *Mammone*, 139 Ohio St. 3d 467 (2014), or during postconviction review, *State v.*
> *Mammone*, 2012-Ohio-3546 (Ohio App.), that does not necessarily mean the

claim is unexhausted. Rather, the claim would be unexhausted only if there were some state-court process by which the petitioner could litigate this claim now.

But no such process exists because the evidence on which the claim rests is not "new."

The two state-court processes theoretically open to petitioner are a successive postconviction petition and a delayed motion for a new trial. (Doc. 27 at 3) (petitioner arguing that he could litigate his "new" ineffective-assistance claims in either proceeding).

To file a successive postconviction petition, petitioner would have to show, *inter alia*, that he was "unavoidably prevented from discovery of the facts upon which [he] must rely to present the claim for relief." O.R.C. § 2953.23(A)(1)(a). Similarly, to file a delayed motion for a new trial, petitioner would need to show "by clear and convincing evidence that [he] was unavoidably prevented from the discovery of the evidence upon which" his motion rests. Ohio Crim. R. 33(B).

Here, however, the factual predicate of this *Strickland* claim—the existence of petitioner's alleged Autism Spectrum Disorder—was available, and likely already in the hands of the defense, at trial: as petitioner explains, the source of this claim is petitioner's "history" and "records." (Doc. 23 at 66, ¶ 162).

To be sure, Dr. Mosnik's 2017 forensic evaluation making the diagnosis is "new" in the sense that, having been prepared only last year, it did not exist at the time of the 2010 trial.

Nevertheless, all of the materials on which Mosnik based her opinion—with the exception of her interview and testing of petitioner in 2017—were available to the defense at trial (and during postconviction proceedings). (Doc. 23–1 at 2–3) (list of 22 items Mosnik reviewed, none of which is dated after the conclusion of postconviction proceedings).

At trial, moreover, the defense engaged Dr. Jeffrey Smalldon, "a psychologist who testified as a defense expert during the mitigation phase." *Mammone*, *supra*, 139 Ohio St. 3d at 495. Dr. Smalldon conducted an "extensive and wide-ranging psychological evaluation of Mammone" before trial that included "cognitive and neuropsychological testing." *Id.* at 514, 515. To the extent that petitioner's medical records might have supported a finding of Autism Spectrum Disorder, that evidence was there for the taking.

In sum, petitioner failed to present this ineffective-assistance claim to the Ohio courts, and the Ohio courts would not permit him to litigate that claim now. Accordingly, the claim is procedurally defaulted, not unexhausted, and it provides no basis for a stay under *Rhines*.

*Mammone III*, *supra*, 2018 WL 454432 at *2.

In his traverse, Mammone again argues that "[t]he systemic failure of the state court process prevented post conviction counsel from litigating Mammone's case effectively." (Doc. 34, PageID 11522). He contends that his procedural default can therefore be excused under *Martinez* and *Trevino*.

Assuming, as I did previously, that these cases apply here, I cannot excuse the default for two reasons.

First, the factual basis of the claim was apparent from the record, and Mammone's postconviction counsel worked with a forensic psychologist (Dr. Stinson) in preparing the petition. Accordingly, the state trial court's denial of funds to retain a neuropsychologist did not actually prevent Mammone from raising this claim in his collateral attack.

Second, this ineffective-assistance claim is not substantial.

Mammone's claim relies on Dr. Mosnik's opinion in 2017 that "a diagnosis of an Autism Spectrum Disorder . . . should be raised" for Mammone, "given [his] reported history of persistent deficits in social communication and social interaction and his apparent restricted range of interests and involvement in activities." (Doc. 23–1, PageID 11297). As further support for her diagnosis, Mosnik cited "a lack of meaningful friendships and romantic involvement over [Mammone's] lifetime, a pattern of rigid perfectionistic thinking, obsessive compulsive behaviors [and] a history . . . of underachievement and lack of direction despite [Mammone] often being told that he was highly intelligent." (*Id.*).

In contrast, Dr. Smalldon, who reviewed the same records as Dr. Mosnik, did not render a diagnosis of Autism Spectrum Disorder. Nor did Dr. Stinson, the forensic psychologist whom

Mammone retained in connection with his postconviction petition. (Doc. 10 –22, PageID 2186–94).

Nowhere in Mosnik's report, moreover, does she fault Smalldon for failing to diagnose Mammone with Autism Spectrum Diagnosis. (Doc. 23–1). That omission contrasts notably with Dr. Mosnik's criticism of Smalldon for "neglect[ing] to appreciate important information in [Mammone's] history" and incorrectly diagnosing him with "a personality disorder" instead of "the clinical diagnosis of a major mood disorder. (*Id.*, PageID 11298). In this respect, Mosnik's report does not yield an inference that trial counsel should have recognized that Smalldon obviously erred in failing to diagnose Mammone with Autism Spectrum Disorder.

"Absent a showing that trial counsel reasonably believed that Dr. [Smalldon] was somehow incompetent or that additional testing should have occurred" – a showing that Mammone has not made – "simply introducing the contrary opinion of another mental health expert during habeas review is not sufficient to demonstrate the ineffectiveness of trial counsel." *McGuire*, *supra*, 738 F.3d at 758.

For these reasons, Mammone does not have a substantial claim under *Strickland*'s performance prong. His default is therefore not excusable under *Martinez* and *Trevino*.

Nor has Mammone made a substantial showing that, but for counsel's failure to introduce evidence that he suffered from Autism Spectrum Disorder, there was a reasonable probability of a different result at the penalty phase. To show prejudice, Mammone must "point to evidence that differ[s] in a substantial way – in strength and subject matter – from the evidence actually presented at sentencing." *Caudill v. Conover*, 881 F.3d 454, 464 (6th Cir. 2018).

Mammone cannot make such a showing, however, because Dr. Smalldon's testimony covered essentially the same ground as Dr. Mosnik's Autism Spectrum Diagnosis. (Doc. 11–6, PageID 6029–126).

Smalldon's goal, he explained to the jurors, was to "make it possible to see some of [Mammone's] actions in light of his psychological makeup." (*Id.*, PageID 6048). Like Dr. Mosnik, Dr. Smalldon opined that, while Mammone was "viewed as very bright," he was also a "very uneven student" and a chronic underachiever. (*Id.*, PageID 6059–60). Where Dr. Mosnik emphasized Mammone's lack of meaningful friendships and romantic relationships, Smalldon testified that Marcia Eakin, his (former) wife of ten years whom he met when he was twenty-three, was Mammone's "first serious girl friend[.]" (*Id.*, PageID 6063).

Just as Dr. Mosnik opined that Mammone displayed "rigid perfectionistic thinking and obsessive compulsive behaviors," Dr. Smalldon found, for example, that Mammone described his wife "in highly idealized terms, in a way that [Smalldon] later came to realize is sort of typical of his way of thinking about relationships and about things in general." (*Id.*, PageID 6063–64). Likewise, Mammone's personality was marked by a preoccupation with "very abstract or odd" and "rigid" and "unwavering . . . thinking patterns[.]" (*Id.*, PageID 6078–79).

Further, "[i]n considering the potential prejudice of omitting this additional testimony, it's important to keep in mind the State's evidence on the other side of the scale." *Caudill*, *supra*, 881 F.3d at 464.

That evidence conclusively proved that Mammone stabbed his two children – at the time of the killings helplessly strapped into their car seats – to death before searching out his mother-in-law, shooting her in the chest and face at point-blank range, and bludgeoning her with a gun and a lamp. Mammone meticulously planned and carefully prepared for this episode, the details

of which he confessed to police and reiterated to the jury during his lengthy unsworn statement at the penalty phase.

Perhaps making the case for death even stronger, Mammone was insistent – adamant, even – that he had done the "right thing" by killing his children, to "spare" them from living in a world where their mother had divorced him. *Mammone*, *supra*, 139 Ohio St. 3d at 473. Not once, Dr. Smalldon testified, did Mammone question "the rightness" of having murdered his children or express regret for having done so, and he even professed himself a devoted father after the killings. (Doc. 11–6, PageID 6062).

Mammone takes the position that these statements only prove that he acted because of his mental illness and/or Autism-Spectrum Disorder, but the jury could plausibly have rejected that view and considered them compelling evidence of Mammone's callousness and lack of remorse.

In the end, Dr. Smalldon's testimony provided a framework that the jurors could have used to reach some understanding of, to find some mitigating circumstances in, Mammone's commission of a heinous triple murder. Dr. Mosnik's diagnosis of Autism Spectrum Disorder, resting as it does on many of the same themes that Dr. Smalldon conveyed to the jury, does not significantly add to or expand upon that framework, nor, quite candidly, make it any more compelling when weighed against the overwhelming evidence in aggravation.

I therefore conclude that "[t]he jury did not sentence [Mammone] to die because [his] lawyers were ineffective" in not presenting this diagnosis. *Caudill*, *supra*, 881 F.3d at 465. "They did so because of [his actions]." *Id.*

Because Mammone's ineffective-assistance claim relating to the Autism Spectrum Disorder is defaulted, and no grounds exist to excuse that default, habeas relief is unavailable.

### 3. Mitigation Witnesses

Mammone next claims that trial counsel failed to "properly investigate and prepare mitigation witnesses." (Doc. 23, PageID 11233).

Trial counsel called Mammone's mother Gilise to testify at the penalty phase. Mammone contends that counsel should have questioned her about her own traumatic upbringing (including a history of sexual abuse by her alcoholic father), her history of mental illness, and the abuse that Mammone's father subjected him to. (*Id.*, PageID 11235–36). Mammone then claims that counsel failed to prepare Gilise to give effective mitigation testimony, and that this failure caused her to give testimony that hurt the mitigation case. (*Id.*, PageID 11237–38).

Mammone also alleges that trial counsel failed to prepare Mammone's father James Jr. to testify effectively. (*Id.*, PageID 11238). He observes that when "James Jr. took the stand, he denied the very information that counsel was presenting in mitigation": their abusive father-and-son relationship. (*Id.*).

Finally, Mammone claims that counsel failed to "investigate or interview" Mammone's uncle and Gilise's brother Stephen DeOrio. (*Id.*, PageID 11239–40). DeOrio would have testified that "he was shocked" when he heard that Mammone had killed his children and mother-in-law, that his and Gilise's father was an abusive alcoholic, and that he knew that his father had sexually abused Gilise. (*Id.*).

### a. Preparation of Gilise and James Jr.

The Ohio Supreme Court held on direct appeal that counsel were not deficient in their preparation of Mammone's parents, and that Mammone had not shown prejudice:

> {¶ 160} Mammone contends that counsel also provided ineffective assistance during the second phase of his trial by failing to properly interview and prepare the defense's mitigation witnesses. Mammone asserts that information harmful to his mitigation defense emerged during the prosecutor's cross-examination of his

mother, Gilise Mammone, and during the direct testimony of his father, James Mammone Jr.

{¶ 161} On direct examination, Gilise testified that Mammone regretted his actions and knew that what he did was wrong. But on cross-examination, she did not effectively dispute the prosecutor's allegation that Mammone continued to maintain that he had no regrets. She also did not dispute that Mammone had told her that Marcia "got exactly what she was told she would get," and she conceded that "[f]rom what he tells me, he's warned her and warned her about it."

{¶ 162} Mammone argues that the jury would not have heard this harmful testimony if counsel had fully interviewed Gilise before the hearing and better prepared her to testify. But there is no evidence that counsel did not fully interview Gilise or adequately prepare her. To establish that "would require proof outside the record," and such a claim "is not appropriately considered on a direct appeal." *State v. Madrigal*, 87 Ohio St.3d 378, 391, 721 N.E.2d 52 (2000). Further, Mammone's counsel may have been aware of potential pitfalls in Gilise's testimony but nevertheless still made a reasonable strategic decision to put her on the stand. *See State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, at ¶ 115 (counsel's decision to call a witness "reflected reasonable trial strategy"). Gilise had valuable information to offer the jury about Mammone's childhood and history of abuse, and counsel may have decided that the information was more important than avoiding potentially unfavorable testimony on cross-examination. Therefore, Mammone cannot show that counsel were deficient in this regard.

{¶ 163} Further, Mammone cannot show a reasonable likelihood that but for counsel's alleged error, he would not have been sentenced to death. Mammone argues that Gilise conveyed two facts to the jury: (1) that Mammone felt that Marcia got what she deserved and did not regret the murders of the children and (2) that Mammone had repeatedly warned Marcia that there would be grave consequences for her actions. But Mammone's unsworn statement and Dr. Smalldon's testimony conveyed essentially the same information to the jury. Gilise's testimony in this regard was merely cumulative and does not provide a sufficient basis for establishing prejudice.

{¶ 164} Mammone similarly argues that counsel's mitigation investigation and preparation of his father, James Jr., was deficient because his father's testimony directly contradicted the defense's narrative about Mammone's difficult childhood and relationship with his father. James Jr. testified that he had a good relationship with Mammone when he was a child and denied abusing him or calling him names (at least often). He also made what Mammone characterizes as "bizarre and unfocused comments," which Mammone argues detracted from his mitigation case.

{¶ 165} As with Gilise, Mammone cannot establish that counsel were deficient in preparing James Jr. to testify or that counsel were deficient in allowing him to testify at all. First, there is no evidence that counsel did not fully interview James Jr. or prepare him to testify. Second, counsel may have reasonably decided to put James Jr. on the stand in spite of some apparent contradictions between his testimony and the defense's mitigation theory. *See Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, at ¶ 115. James Jr. denied abusing Mammone, but he also candidly admitted that he drank frequently and that he recalled striking Gilise a few times. He also admitted that he regularly blacked out in those days, so that there was much he did not remember about this time period. In light of these statements, defense counsel could reasonably have decided that James Jr.'s testimony would do more good than harm.

{¶ 166} Even if counsel's preparation of James Jr. had been somehow deficient, however, Mammone cannot establish that but for this error, there is a reasonable likelihood that he would have received a life sentence. Much of James Jr.'s testimony was consistent with Mammone's mitigation theory and when it was inconsistent, Mammone had three witnesses to support his version of events—his mother, Dr. Smalldon, and himself.

{¶ 167} In sum, Mammone cannot establish that counsel provided ineffective assistance by failing to adequately interview his mitigation witnesses or prepare them for the mitigation hearing.

*Mammone*, *supra*, 139 Ohio St. 3d at 501–03.

The Ohio Supreme Court's decision was a reasonable application of *Strickland*.

As the court pointed out, there was no evidence in the record on appeal – just as there is no evidence in the habeas record – that counsel inadequately prepared Gilise and James Jr. to testify. With no factual support for this *Strickland* claim, the state court could reasonably find that Mammone failed to show that counsel performed deficiently.

As for prejudice, the Ohio Supreme Court reasonably found that Gilise's "harmful" testimony was cumulative to evidence that Mammone himself supplied. The bulk of James Jr.'s testimony was, the court permissibly concluded, consistent with Mammone's mitigation theory: that his father was a drinker and verbally and physically abusive. There was simply no

reasonable probability that, but for James Jr.'s testimony that he and Mammone supposedly had a good relationship, Mammone would have received a sentence other than death.

### b. Gilise's Upbringing and DeOrio's Testimony

As I explained in *Mammone III*, *supra*, 2018 WL 454432 at *2–3, Mammone never argued in state court that counsel were ineffective for failing to: 1) elicit testimony from Gilise about her own traumatic upbringing; or 2) investigate or interview Stephen DeOrio. The claim is therefore procedurally defaulted. Furthermore, I cannot excuse the default under *Martinez* and *Trevino* because the underlying *Strickland* claim is insubstantial.

First, regarding Gilise's proposed testimony, nothing in her 2017 affidavit establishes that trial counsel were unaware of her traumatic upbringing or failed to consider eliciting such testimony from her. (Doc. 23–3).

That evidence, moreover, had only a tenuous connection to Mammone himself. While Mammone claims that counsel's blunder denied the jury knowledge of "the severe multi-generational mental illness, physical and sexual abuse that plagued his extended family" (Doc. 23, PageID 11237), Mammone himself was not a victim of sexual abuse, he did not have a mental breakdown that required him to be institutionalized, and the jury in any event heard evidence not only that he had a severe mental disorder but also that his father had abused him.

In these circumstances, counsel could reasonably decide not to elicit evidence from Gilise about her own difficult life.

Nor is there a substantial basis to conclude that the failure to elicit this testimony was prejudicial: that Mammone's mother was a victim of sexual abuse and had mental-health problems was not reasonably likely to change the balance of aggravating and mitigating evidence before the jury.

Second, DeOrio's affidavit established that one of Mammone's lawyers spoke to him by telephone before the trial began, though the conversation "only lasted a few minutes" and did not cover "the family history." (Doc. 23–4, PageID 11313).

Furthermore, it is undisputed – though ignored by Mammone – that Dr. Smalldon interviewed DeOrio as part of his "wide-ranging psychological investigation" into Mammone's background. (Doc. 11–6, PageID 6050). While the record does not establish what the two talked about, Dr. Smalldon explained that he had interviewed Mammone's family members to "shed light on aspects of the individual's functioning at different stages of his . . . life." (*Id.*).

This evidence establishes that trial counsel were familiar with DeOrio and in a position to make a reasonable decision whether to call him as a mitigation witness. Mammone has not made a substantial showing that it was unreasonable for counsel not to call DeOrio. In accordance with *Strickland*, I presume that they made a reasonable decision not to have him testify.

For these reasons, habeas relief is unavailable.

### 4. Mammone's Unsworn Statement

Mammone next faults trial counsel for "allow[ing]" him to make a five-hour unsworn statement at the penalty phase. (Doc. 23, PageID 11241–42). He claims that counsel failed to "guide or limit the presentation by asking questions although counsel could have sought to do so." (*Id.* at 11241). Because counsel failed "to present a context within which to interpret the unsworn statement," Mammone argues that his "detailed, cold and detached narrative was likely disturbing to jurors." (*Id.*).

On direct appeal, the Ohio Supreme Court held that this claim was meritless:

{¶ 168} Mammone argues that counsel provided ineffective assistance by failing to prepare him for mitigation, by allowing him to make a five-hour unsworn statement, and by failing to limit or guide his statement in any way.

{¶ 169} At his mitigation hearing, Mammone presented a lengthy unsworn statement—spanning more than 250 pages in the transcript—that described his upbringing, his relationships with Marcia and his children, the events leading up to June 7 and 8, 2009, and the murders themselves. He began by stating that his intent was to give the jury "a firsthand account of what I did and how I was feeling and thinking at the time." He concluded by saying that he is full of regrets and expressing hope that others will learn from this tragedy by renewing their commitments to God, their marriage, and their children. Ultimately, the court directed Mammone to "[w]rap it up," and he responded by stating, "I've said my piece, Judge."

{¶ 170} Mammone cannot establish that counsel were ineffective by allowing him to make this long unsworn statement. Mammone, "not counsel, had the choice whether to testify or give an unsworn statement." (Emphasis added.) *State v. Brooks*, 75 Ohio St.3d 148, 157, 661 N.E.2d 1030 (1996). And regardless, "the decision to give an unsworn statement is a tactical one, a call best made by those at the trial who can judge the tenor of the trial and the mood of the jury." *Id*.

{¶ 171} Mammone's statement was well spoken, coherent, and organized. For the most part, the statement amplified the confession Mammone had made to police officers the day he was arrested and gave the jury an opportunity to observe his personality and learn more about his background. Moreover, because the court permitted Dr. Smalldon to observe the statement, Dr. Smalldon was able to refer to it during his own testimony. Under the circumstances, to the extent that trial counsel may have influenced Mammone's decision to give an unsworn statement, allowing the statement was objectively reasonable as a matter of strategy. *See State v. Jalowiec*, 91 Ohio St.3d 220, 237, 744 N.E.2d 163 (2001).

{¶ 172} Moreover, even if counsel had somehow performed deficiently with regard to Mammone's unsworn statement, this conduct was not prejudicial. Mammone speculates that the statement was harmful because it was long, cold, and detached and because the jury had no context for connecting it to Mammone's mental illness. But Mammone cannot establish a reasonable likelihood that he would have been sentenced to life imprisonment if not for this statement. For the most part, Mammone's statement amplified his confession statement to police officers, which was played for the jury at trial.

*Mammone*, *supra*, 139 Ohio St. 3d at 503–04.

The Ohio Supreme Court's decision was objectively reasonable.

First, it was Mammone's decision – not counsel's – whether to make an unsworn statement. *See* O.R.C. § 2929.03(D)(1). There is no evidence in the record, moreover, to prove that counsel did not help prepare Mammone to give the statement. For all that the (essentially

empty) record discloses, counsel may have tried hard to dissuade Mammone from making the statement, or counsel may have advised Mammone on how to limit the damage – only to have Mammone simply ignore the advice.

In these circumstances, it was reasonable for the Ohio Supreme Court to hold that counsel's performance was not deficient.

Second, there was no probability – let alone a reasonable one – of a different result had counsel more effectively "guided" Mammone's statement or persuaded him not to give one. While it seems to me that the Ohio Supreme Court underestimated, perhaps considerably, the prejudicial impact of Mammone's extremely disturbing remarks, it cannot be gainsaid that the prosecution's case in aggravation was beyond overwhelming. Without dwelling on the details, this was a heinous triple-murder case where Mammone murdered his own children and mother-in-law to punish his ex-wife for divorcing him.

Underscoring how a reasonable judge might reject this *Strickland* claim on prejudice grounds is a passage from Justice O'Neill's opinion concurring in part and dissenting in part from the Ohio Supreme Court's judgment on direct appeal. Justice O'Neill dissented only on the ground that, in his view, capital punishment is unconstitutional. Yet even Justice O'Neill acknowledged that Mammone's case was so disturbing that it "challenges my resolve to stay the course regarding the unconstitutionality of the death penalty in Ohio." *Id.* at 519 (O'Neill, J., concurring in part and dissenting in part). He continued:

> It is incomprehensible how someone could murder his own children while they are helplessly strapped into their car seats. Five-year-old Macy and three-year-old James were stabbed in their throats by their father for absolutely no reason other than to make their mother suffer.

*Id.*; *see also id.* (describing Mammone as an "atrocious monster[ ]," "evil," and "deprav[ed]").

Fairminded judges could accordingly have rejected Mammone's claim on the ground that, even if Mammone had given a more controlled statement (or none at all), there was simply no probability of the jury's recommending anything but a death sentence.

### 5. Prosecutorial Misconduct

Mammone argues that trial counsel were ineffective for not objecting to "all instances of prosecutorial misconduct" at the penalty phase. (Doc. 23, PageID 11243). The sole instance of alleged misconduct during the penalty phase was Mammone's claim that the prosecutor improperly urged the jury to impose the death penalty because of a non-statutory aggravating factor: revenge. (*Id.*, PageID 11224–26).

As I explain in more detail below, the Ohio Supreme Court found (reasonably and correctly) that this argument was proper: because each aggravated-murder charge included a "course of conduct" specification, and because the jury found Mammone guilty of those charges, the prosecutor was free to argue that Mammone's admitted desire to hurt his ex-wife was part of that course of conduct and thus an aggravating factor warranting a death sentence. *Mammone*, *supra*, 139 Ohio St. 3d at 498.

The Ohio Supreme Court's summary disposition of this claim on direct appeal was reasonable. (Doc. 10–20, PageID 1546–47) (Mammone's direct-appeal brief); *Mammone*, *supra*, 139 Ohio St. 3d at 503–04. Because the prosecutor's argument was proper, trial counsel had no basis to object, and there was no probability either of the trial court sustaining the objection or a different outcome at the penalty phase.

## 6. Arbitrariness of the Death Penalty in Stark County

Finally, Mammone argues that trial counsel were ineffective for not presenting evidence "establishing the arbitrariness of the death penalty's application in Stark County." (Doc. 23, PageID 11244–46).

In support, Mammone notes that the Stark County prosecutor "capitally indicted 53 people" between 1982 and 2010. (*Id.*, PageID 11245). But only six of those defendants received a death sentence. (*Id.*). In addition, the prosecutor "authorized a plea or other deal in 26 (or 49) percent of the 53 cases resulting in something other than a death sentence." (*Id.*).

Mammone concludes that, "[w]hether the prosecutor uses death penalty indictment as a bargaining chips, a scare tactic, or for some other impermissible purpose, there is an arbitrary practice in Stark County to use death indictments to achieve other goals." (*Id.*). Had trial counsel presented this information to the trial court, Mammone argues, the court would have concluded that the Eighth Amendment prohibited a death sentence.

The Ohio Court of Appeals rejected this claim on postconviction appeal:

{ ¶ 27}  Appellant's fifth and sixth grounds for relief argued his trial counsel was ineffective for failing to attack the Stark County Prosecutor's Office for its arbitrary, capricious, and discriminating practice in indicting the death penalty. Appellant argued this issue violates his rights to equal protection under the United States Constitution.

{ ¶ 28}  Appellant argues he has supported this claim with items dehors the record and is entitled to a hearing. The submitted items dehors the record are Exhibits F, G, H, and I attached to appellant's petition. However, these exhibits are not of evidentiary quality. Also, having served ten years on the Common Pleas bench, this writer is aware that Exhibit F, titled "Stark County Death Penalty Indictments," is an incomplete list.

{ ¶ 29}  The trial court found the arguments on this issue to be barred by the doctrine of res judicata, citing *Perry*, *supra*, and the Supreme Court of Ohio's decision in *State v. Jenkins* (1984), 15 Ohio St.3d 164, 473 N.E.2d 264. The *Jenkins* court at paragraph one of the syllabus held, "Ohio's statutory framework for imposition of capital punishment, as adopted by the General Assembly

effective October 19, 1981, and in the context of the arguments raised herein, does not violate the Eighth and Fourteenth Amendments to the United States Constitution or any provision of the Ohio Constitution." The *Jenkins* court at 169 specifically addressed the discretionary role of the state's elected prosecuting attorney, citing Justice Stewart's opinion in *Gregg v. Georgia* (1976), 428 U.S. 153, 199, 96 S.Ct. 2909, 49 L.Ed.2d 859:

> {¶ 30} "'First, the petitioner focuses on the opportunities for discretionary action that are inherent in the processing of any murder case under Georgia law. He notes that the state prosecutor has unfettered authority to select those persons whom he wishes to prosecute for a capital offense and to plea bargain with them. Further, at the trial the jury may choose to convict a defendant of a lesser included offense rather than find him guilty of a crime punishable by death, even if the evidence would support a capital verdict. And finally, a defendant who is convicted and sentenced to die may have his sentence commuted by the Governor of the State and the Georgia Board of Pardons and Paroles.

> {¶ 31} "'The existence of these discretionary stages is not determinative of the issues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. *Furman* [*v. Georgia* (1972), 408 U.S. 238], in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution. * * *'"

{¶ 32} We find the trial court did not err in denying appellant's fifth and sixth grounds for relief.

*Mammone II*, *supra*, 2018 WL 3200685 at *3–4.

The state court's disposition of this ineffective-assistance claim was not unreasonable.

The Sixth Circuit and district courts within the Circuit have uniformly rejected claims that Ohio's death-penalty regime is unconstitutional because it is impermissibly arbitrary and gives prosecutors too much discretion. *E.g.*, *Williams v. Bagley*, 380 F.3d 932, 963 (6th Cir. 2004); *Coleman v. Mitchell*, 268 F.3d 417, 441 (6th Cir. 2001); *Benge v. Johnson*, 312 F. Supp. 2d 978, 1031 (S.D. Ohio 2004); *Jamison v. Collins*, 100 F. Supp. 2d 647, 762 (S.D. Ohio 2002);

*Jackson v. Houk*, 2008 WL 1946790, *71 (N.D. Ohio 2008) (Nugent, J.) (rejecting challenge to prosecutor's discretion during the indictment phase).

The Ohio courts have also rejected these claims. *State v. Jenkins*, 15 Ohio St. 3d 164 (1984); *accord State v. Mink*, 101 Ohio St. 3d 350, 365 (2004); *State v. Hale*, 2016-Ohio-5837, ¶46 (Ohio App. 2016); *State v. Skatzes*, 2003-Ohio-516, ¶¶393–94 (Ohio App. 2003).

And "it is settled that capital punishment is constitutional." *Glossip v. Gross*, --- U.S. ---, 135 S. Ct. 2726, 2732 (2015).

In light of these authorities, and the Ohio Supreme Court's own ruling in *State v. Jenkins*, 15 Ohio St. 3d 164 (1984), there was no possible merit in the argument that Mammone faults counsel for not making. The state court's decision rejecting this *Strickland* claim was not unreasonable.

## I. *Brady* and *Napue* Claims

In his tenth ground for relief, Mammone alleges that the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose evidence that his blood and urine samples tested positive for benzodiazepines. (Doc. 23, PageID 11216–19). In his eleventh ground for relief, Mammone alleges that the prosecution violated *Napue v. Illinois*, 360 U.S. 264 (1959), by knowingly introducing false testimony from Jay Spencer, an analyst at the Canton-Stark County Crime Laboratory, that there were no benzodiazepines in his blood or urine. (*Id.*, PageID 11220–24).

### 1. Background

Spencer testified that he tested samples of Mammone's blood and urine (which authorities obtained shortly after arresting Mammone) for the presence of "any type of drug residue evidence, any kind of drugs or drug metabolites[.]" (Doc. 11–4, PageID 5211).

The analysis proceeded in two steps. First, Spencer performed an immunoassay, which is a screening test that can identify "classes of drugs and direct [his] examination otherwise." (*Id.*). He then used a gas chromatography mass spectrometer (GCMS) "to identify any kind of and confirm any kind of drugs that might be in that sample." (*Id.*, PageID 5212). Based on this testing, Spencer opined that Mammone's blood was "negative for any drugs that I was testing for." (*Id.*, PageID 5213).

During postconviction review, Mammone's attorneys obtained Spencer's lab worksheets and notes, which, it is undisputed, the prosecution did not disclose before trial. (Doc. 10–22, PageID 2437). These documents show that, when Spencer performed the immunoassay (also called an ELIZA) on the blood and urine samples, he obtained a "positive result for benzodiazepines[.]" (*Id.*, PageID 2243–46). Spencer's notes also establish that, after testing the samples via the GCMS, Mammone's blood and urine were negative for benzodiazepines. (*Id.*, PageID 2244, 2246).

### 2. State Courts' Decisions

Relying on Spencer's worksheets and notes, Mammone raised *Brady* and *Napue* claims in his postconviction petition. The state trial court rejected the claims, and the state appellate court affirmed:

> {¶ 34}  Appellant's eighth and ninth grounds for relief argued the state failed to disclose exculpatory evidence. Appellant submitted blood and urine samples. The preliminary notes of criminalist Jay Spencer in analyzing the samples indicated a positive result for Benzodiazepines. The confirming analysis was negative as was Mr. Spencer's opinion at trial. Vol. VI T. at 63–64. Because of the lack of disclosure of the preliminary findings, appellant argued he was denied an effective argument at the suppression hearing [on the motion to suppress his confession]: the taking of Valium prior to his arrest thereby affecting his confession. Appellant further argued this evidence could have countered the state's implication during final argument that he was not truthful about taking drugs. Vol. VIII T. at 53–54. Appellant argued this non-disclosure is a violation of *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215,

wherein the United States Supreme Court held at 87, "[w]e now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

{¶ 35} The trial court concluded Mr. Spencer's testimony was not false because the confirmation test established the samples were negative for drugs. The trial court also concluded the presence or absence of drugs in appellant's system was not material to whether he committed the crimes, and the claimed ingestion of Valium was thoroughly vetted during the suppression hearing. November 24, 2009 T. at 42–43, 45–46, 47–48, 59–60, 67.

{¶ 36} Although the trial court's conclusions are correct, even without the confession, we find the overwhelming evidence presented at trial persuades us that any failure to disclose the complained of evidence did not prejudice appellant in the guilty phase of the trial.

{¶ 37} Marcia Eakin testified during the trial. Ms. Eakin was appellant's ex-wife, and the mother of the children-victims, Macy and James, and the daughter of the adult-victim, Margaret Eakin. She testified throughout the evening preceding the deaths, appellant texted her and called her with veiled threats regarding the children's safety who were spending the evening with him. Vol. V T. at 56–63, 69–71; State's Exhibit 15. The children were with appellant all evening until they were found dead in the backseat of appellant's vehicle the next morning. *Id*. at 159. Appellant's vehicle was seen at the residence of Margaret Eakin at the time of her death by neighbors who ran outside after hearing gunshots. *Id*. at 125, 128–129.

{¶ 38} In the morning, appellant called Ms. Eakin and admitted to her that he had killed her mother and the children. *Id*. at 78–79. After his arrest, as the blood on appellant's hands was being swabbed for evidence, appellant gratuitously stated to Canton Police Crime Scene Officer Randy Weirich that he used his left hand in stabbing the children and beating his former mother-in-law. *Id*. at 220–221. Appellant left a voicemail for his friend, Richard Hull, and admitted his plan to kill the children and his former mother-in-law as vengeance for the divorce. State's Exhibit 64. The time of the voicemail was prior to the time he claimed to have taken any pills. Vol. VII T. at 46; Sentencing Phase Vol. I T. at 285–286.

{¶ 39} A bloody knife was found in the backseat of appellant's vehicle where the children were found stabbed and dead in their car seats. Vol. V T. at 204; State's Exhibit 2K and 28. Many of the blood samples taken from the evidence contained a mixture of DNA profiles and shared genetic types. Vol. VI T. at 164, 170, 172–173. The blood on the knife belonged to James and possibly Macy. *Id*. at 164–165. Appellant's hands contained the blood of Margaret Eakin and possibly James and Macy. *Id*. at 170–172, 173–174; State's Exhibit 45. Appellant's blood was found on the firearm used to shoot Margaret Eakin. *Id*. at

184–185; State's Exhibit 23B. Appellant's fingernail clippings contained the blood of his son. *Id.* at 190–191; State's Exhibits 48A and B.

{¶ 40}  Even without the confession that appellant now argues might be tainted because of drug consumption, the evidence is overwhelming and conclusive of appellant's guilt.

{¶ 41}  Appellant further argued the prosecutor's remarks during closing argument implied that he had lied about taking drugs:

{¶ 42}  "[MR. BARR:] The pills. Why did he take the pills? Let's talk about these alleged pills that don't show up in anybody's blood, although he took dozens. Again, reason and common sense, folks, just use it. He didn't take the pills to calm him down or to dull the pain. Listen to what he says in his statement.

{¶ 43}  "Detective George said what kind of pills? Like Valium and some kind of pain killer. I don't even know. I took a pill last night. He took one pill at 9:00. That's the pill that he took in case he got shot when he finished his plan at 5:45, 5:50 the next morning. The next dozen he took after the killings and he thought if it calms me down or helps me or helps me or just whatever. That's why he took the pills. Because maybe he was a little shook up after he'd just taken three lives. He took those pills to calm him down. Because he'd just finished his plan because remember, he didn't want to commit suicide. He didn't want to die. He wanted Macy and James and Margaret to die. But not James Mammone. He didn't want to die. He didn't want to walk up those steps in Marcia's house. He didn't want to make himself a sitting duck because he wanted to live. Because his goal was to inflict pain on Marcia." Vol. VIII T. at 53–54.

{¶ 44}  We find the argument to fall short of any question about false testimony from Mr. Spencer. The statements were made during closing argument and the prosecutor invited the jury to judge appellant's claim vis-à-vis appellant's actual statement to the police. State's Exhibit 13.

{¶ 45}  We find the trial court did not err in denying appellant's seventh and eighth grounds for relief.

*Mammone II*, *supra*, 2012 WL 3200685 at *4–6.

### 3. Analysis

#### a. *Brady*

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, *supra*, 373 U.S. at 87.

"Evidence qualifies as material when there is any reasonable likelihood it could have affected the judgment of the jury." *Wearry v. Cain*, --- U.S. ---, 136 S. Ct. 1002, 1006 (2016). To prevail, a defendant "need not show that he more likely than not would have been acquitted had the new evidence been admitted." *Id.* "He must show only that the new evidence is sufficient to undermine confidence in the outcome." *Id.*

The Ohio Court of Appeals's decision was not an unreasonable application of *Brady*'s materiality prong. Whether Mammone had taken Valium on the night of the murders, and whether there were any benzodiazepines in his system, were only tangential issues at trial.

For one thing, the trial court and the parties explored that issue in depth during a pretrial hearing on the defense motion to suppress Mammone's confession. There the trial court heard evidence that, despite Mammone's claim to have taken a Valium and drank wine, police observed no signs that Mammone may have been intoxicated while giving his confession. Indeed, when the trial court denied that motion, it expressly found "no evidence that [Mammone] was under the influence." (Doc. 11–1, PageID 3856). Thus, Spencer's notes were not material to the admissibility of Mammone's confession.

For another, it was reasonable for the state court to find that the evidence was not material to Mammone's guilt. As the court of appeals held, the evidence against him was overwhelming. Mammone made repeated threats to harm his children while texting his ex-wife

shortly before the murders. It was undisputed that he had custody of his children on the night of the killings, and that police found the children's bodies strapped into their car seats in Mammone's car. He left a voicemail (at a time before he claimed to have taken pills) for a friend admitting that he planned to kill James and Macy to punish his ex-wife. Mammone admitted to a police officer that he used his left hand to stab the kids and beat his former mother-in-law. Forensic testing established that his children's blood was literally on his hands.

Finally, Mammone claims that the failure to disclose Spencer's notes prejudiced him because "this evidence could have been given to [Dr. Smalldon] . . . who was prevented from considering this information during his mitigation evaluation." (Doc. 23, PageID 11218).

This argument fails because Mammone has not made a plausible showing that this information had any mitigating force. After all, Dr. Smalldon – who was indisputably aware of Mammone's claim to have taken "pills" and wine – testified that Mammone never "tried to convince me that . . . these offenses occurred" because "he was out of his mind on drugs or wine or anything . . . when these happened." (Doc. 11–6, PageID 6070–71).

Because the state court reasonably found that Spencer's notes were not material, habeas relief is unavailable.

### b. *Napue*

"[A] conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue*, *supra*, 360 U.S. at 269. "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.*

To prevail on a *Napue* claim, the defendant must show "(1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false." *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998).

Here the state appellate court affirmed the trial court's finding that "Mr. Spencer's testimony was not false because the confirmation tests established the samples were negative for blood." *Mammone II*, *supra*, 2012 WL 3200685 at *5.

This was a reasonable determination of the facts. As the trial court found, Spencer's testing protocol provided that, if the initial immunoassay/ELIZA reported the presence of a drug, but the GCMS did not confirm the presence of a drug, Spencer was to deem the test result "negative." (Doc. 10–22, PageID 2437 (citing Ohio Admin. Code § 3701-53-03(B)). Mammone does not cite any evidence or authority to support his contention that Spencer should have interpreted the test as "positive" for benzodiazepines.

For this reason, it was permissible for the state court to find that Spencer's testimony was not "actually false."

### J. Prosecutorial Misconduct – Penalty Phase Closing Argument

In his twelfth ground for relief, Mammone alleges that the prosecutor improperly urged the jury that "revenge against Marcia Eakin [Mammone's ex-wife] was an aggravating circumstance[.]" (Doc. 23, PageID 11225). Because such comments allegedly touched on "non-statutory aggravating circumstances," Mammone contends that the prosecutor "improperly tipped the scales in favor of death." (*Id.*, PageID 11226).

# 1. State Court's Decision

The Ohio Supreme Court rejected this claim on direct appeal, holding that Mammone

failed to show that the comments – to which he did not object – amounted to error, let alone plain

error:

{¶ 142} Finally, Mammone contends that the prosecutor improperly argued that revenge was an aggravating circumstance during closing arguments at the mitigation phase. Mammone did not raise this objection at trial, so he has waived all but plain error. *See Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, at ¶ 89.

{¶ 143} In Ohio, the second phase of a capital trial has a specific purpose: the jury must determine "whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors" beyond a reasonable doubt. R.C. 2929.03(D)(2). "[T]he 'aggravating circumstances' against which the mitigating evidence is to be weighed *are limited to* the specifications of aggravating circumstances set forth in R.C. 2929.04(A)(1) through (8) that have been alleged in the indictment and proved beyond a reasonable doubt." (Emphasis added.) *State v. Wogenstahl*, 75 Ohio St.3d 344, 662 N.E.2d 311 (1996), paragraph one of the syllabus. The jury shall consider any evidence relevant to those aggravating circumstances, including evidence about the nature and circumstances of those aggravators. *See* R.C. 2929.03(D)(1); *Wogenstahl* at 353, 662 N.E.2d 311.

{¶ 144} As we have long recognized, a prosecutor's argument during the mitigation phase is restricted to issues germane to the jury's weighing process. The prosecutor may comment on any "testimony or evidence relevant to the nature and circumstances of the aggravating circumstances specified in the indictment of which the defendant was found guilty." *State v. Gumm*, 73 Ohio St.3d 413, 653 N.E.2d 253 (1995), syllabus. However, because the jury is not at liberty to consider nonstatutory aggravating circumstances, the prosecutor cannot argue the existence of nonstatutory aggravating circumstances. *See Wogenstahl* at 355, 662 N.E.2d 311 ("in the penalty phase of a capital murder trial, any use of the term 'aggravating circumstances' must be confined to the statutory aggravating circumstances set forth in R.C. 2929.04(A)(1) through (8)").

{¶ 145} Mammone claims that the prosecutor argued a nonstatutory aggravating factor—revenge—in his mitigation-phase closing argument. During closing, the prosecutor discussed the mitigating factors, then asked the jury, "Now, what are the aggravating circumstances that you have to weigh against those mitigating factors?" The challenged portion of the prosecutor's argument stated:

On June 8, 2009, [Mammone] trespassed, by force in the Eakin family home with purpose—not out of anger, because you don't drive around the block to see who's there when you're angry, ladies and gentlemen. You go, you're mad, you're upset. You don't care who's there.

But he wanted Margaret alone and as he told police, because that would be a major [blow] to Marcia.

And in his letter to Marcia, My motivation was to hurt you—talking about killing Margaret. My motivation was to hurt you and bring forth the despair one feels when the whole family is taken from them.

The whole family. Goes back to his plan, to his course of conduct.

And his purpose when he went in there was to kill Margaret Eakin, that 57–year old former kindergarten teacher who made the holidays so special for James. And he committed that murder during an aggravated burglary.

And at the same time he committed another aggravating circumstance. Because Margaret was his third victim. She was the third person that this man purposely killed throughout a course of conduct, motivated by the same driving force, to hurt Marcia.

And prior to that he committed this first aggravating circumstance, when as he had planned, he killed his own daughter, Macy, five years old.

She'd only enjoyed five years on this earth and on that day he decided, James Mammone decided, not a jury, that Macy was to die. She was the first victim in his course of conduct that involved the purposeful killing of three people on the sacred ground that he chose.

But he wasn't done yet. No. Because he had also decided that James must die.

James, who would die at his own father's hands, because he thought it was necessary. James would become the second victim. Three-year old James, the second victim in this course of conduct, again, driven by that similar motivation, the desire to hurt Marcia.

Those are the aggravating circumstances that you must now weigh against the mitigating factors.

And I submit to you, ladies and gentlemen, that this course of conduct was not carried out because of deeply held religious beliefs. This course of conduct was carried out because of * * * [jealousy].

{¶ 146}  Contrary to Mammone's claims, the prosecutor did not improperly refer to nonstatutory aggravating circumstances. The jury had convicted Mammone of a course-of-conduct specification, R.C. 2929.04(A)(5), for each of the three murders, meaning that the jury "'discern[ed] some connection, common scheme, or some pattern or psychological thread'" that tied the offenses together. *State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, syllabus, quoting *State v. Cummings*, 332 N.C. 487, 510, 422 S.E.2d 692 (1992). In his closing argument at the mitigation phase, the prosecutor argued the nature and circumstances of Mammone's course-of-conduct specification. Namely, he argued that jealousy and Mammone's desire to hurt Marcia motivated all three murders. The prosecutor did not suggest that the jury could independently consider revenge as an aggravating circumstance.

{¶ 147}  Even if any of the prosecutor's comments had been improper, Mammone cannot show prejudice because the trial court correctly instructed the jury on the aggravating circumstances and the proper standard to apply in the weighing process. *See Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, at ¶ 90; *State v. Smith*, 87 Ohio St.3d 424, 444, 721 N.E.2d 93 (2000). It is presumed that the jury followed the court's instructions. *State v. Loza*, 71 Ohio St.3d 61, 79, 641 N.E.2d 1082 (1994). Accordingly, we find no plain error.

*Mammone*, *supra*, 139 Ohio St. 3d 496–98.

## 2. Analysis

"On habeas review of alleged prosecutorial misconduct, [courts] must evaluate the totality of the circumstances surrounding each trial to determine if the challenged conduct rendered the trial fundamentally unfair." *Majid v. Noble*, 751 F. App'x 735, 743 (6th Cir. 2018).

"Due process is the touchstone here: "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned.'" *Id.* (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). "Instead, the relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

Setting aside whether there are grounds to excuse Mammone's procedural default of this claim, Mammone has not shown that the Ohio Supreme Court's decision finding no plain error was objectively unreasonable. *Stewart*, *supra*, 867 F.3d at 638. To the contrary, it was correct.

The jury's finding that Mammone killed his children and mother-in-law during a "course of conduct," O.R.C. § 2929.04(A)(5), meant that the jury had found "some connection, common scheme, or some pattern or psychological thread" that tied the crimes together. *Mammone*, *supra*, 139 Ohio St. 3d at 498. As the prosecutor argued, and as the evidence – including Mammone's own statements – showed beyond any possible doubt, the thread was Mammone's jealousy and desire to punish his ex-wife for divorcing him.

The prosecutor's argument was proper, and it was not an unreasonable application of Supreme Court precedent for the Ohio Supreme Court to so conclude. Habeas relief is therefore unavailable on Mammone's twelfth ground for relief.

### K. Constitutionality of the Death Penalty

Mammone next brings two constitutional challenges to Ohio's death penalty regime.

In his thirteenth ground for relief, Mammone argues that Ohio law "permits the imposition of capital punishment in an arbitrary, capricious and discriminatory manner due to the uncontrolled discretion afforded the elected Stark County Prosecutor in determining when to seek the death penalty." (Doc. 23, PageID 11227).

In his seventeenth ground for relief, Mammone alleges that: 1) Ohio's death-penalty law allows for arbitrary and unequal punishment and involves unreliable sentencing procedures; 2) the felony-murder aggravating factor, O.R.C. § 2929.04(A)(7) is unconstitutional because it does not narrow the class of death-eligible murders; 3) the statutory weighing scheme is

unconstitutionally vague; and 4) the death penalty regime is unconstitutional because it does not contain a mercy option. (*Id.*, PageID 11250–69).

## 1. State Courts' Decisions

The Ohio Court of Appeals rejected Mammone's discretion-based challenge to the death penalty during postconviction review. As discussed above with respect to Mammone's claim that trial counsel were ineffective for not challenging the death penalty on this basis, the court of appeals held that "'[t]he existence of . . . discretionary stages'" throughout Ohio's capital punishment system did not violate the Constitution. *Mammone II*, *supra*, 2012 WL 3200685 at *4 (quoting *Gregg v. Georgia*, 428 U.S. 153, 199 (1976) (Stewart, J.)).

For its part, the Ohio Supreme Court rejected Mammone's other challenges to the death penalty:

{¶ 183} In his ninth proposition of law, Mammone presents seven often raised—and always rejected—constitutional challenges to Ohio's capital-punishment scheme. He also argues that Ohio's death-penalty statutes violate international law and treaties and therefore offend the Supremacy Clause of the United States Constitution.

{¶ 184} The court has previously considered and rejected each of these claims:

• Ohio's death-penalty scheme is not imposed in an arbitrary and discriminatory manner. *State v. Ferguson*, 108 Ohio St.3d 451, 2006-Ohio-1502, 844 N.E.2d 806, ¶ 86 (rejecting claims of arbitrary and unequal punishment); *State v. Jenkins*, 15 Ohio St.3d 164, 169–170, 473 N.E.2d 264 (1984) (rejecting arguments regarding prosecutorial discretion); *State v. Steffen*, 31 Ohio St.3d 111, 124–125, 509 N.E.2d 383 (1987) (rejecting assertions of racial discrimination).

• Ohio's statutory weighing scheme is neither unconstitutionally vague nor arbitrary and capricious. *Jenkins* at 171–173 [473 N.E.2d 264].

• Ohio does not unconstitutionally burden a capital defendant's right to trial by jury. *Ferguson* at ¶ 89; *State v. Buell*, 22 Ohio St.3d 124, 138, 489 N.E.2d 795 (1986).

• Ohio's requirement that a defendant must submit to the jury any presentence investigation report or mental evaluation he requests is constitutional. *Ferguson* at ¶ 90; *Buell* at 138 [489 N.E.2d 795].

• Ohio's felony-murder specification is constitutional when applied to aggravated murder under R.C. 2903.01(B). *Jenkins* at 177–178 [473 N.E.2d 264].

• R.C. 2929.03(D)(1) and 2929.04(B) are not unconstitutionally vague. *Ferguson* at ¶ 92; *State v. McNeill*, 83 Ohio St.3d 438, 453, 700 N.E.2d 596 (1998).

• Ohio's review of sentence proportionality and appropriateness is constitutional. *Steffen* at paragraph one of the syllabus; *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 207.

• Ohio's death-penalty scheme does not violate international law. *State v. Short*, 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶ 137–138; *State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 127; *State v. Issa*, 93 Ohio St.3d 49, 69, 752 N.E.2d 904 (2001); *State v. Bey*, 85 Ohio St.3d 487, 502, 709 N.E.2d 484 (1999).

{ ¶ 185}  In light of the above precedent, we reject Mammone's various claims. *See, e.g., State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 215–216; *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 381–383; *State v. Carter*, 89 Ohio St.3d 593, 607–608, 734 N.E.2d 345 (2000).

{ ¶ 186}  As we have previously stated, "Ohio's statutory framework for imposition of capital punishment, as adopted by the General Assembly effective October 19, 1981, and in the context of the arguments raised herein, does not violate the Eighth and Fourteenth Amendments to the United States Constitution or any provision of the Ohio Constitution." *Jenkins*, 15 Ohio St.3d 164, 473 N.E.2d 264, at paragraph one of the syllabus. In addition, we have "rejected the argument that Ohio's death penalty statutes are in violation of treaties to which the United States is a signatory" and thus have held that the statutes do not offend the Supremacy Clause of the United States Constitution. *Bey*, 85 Ohio St.3d at 502, 709 N.E.2d 484.

{ ¶ 187}  Mammone's ninth proposition of law is not well-taken.

*Mammone*, *supra*, 139 Ohio St. 3d at 506–07.

## 2. Analysis

In the absence of any Supreme Court precedent holding that capital punishment is unconstitutional, Mammone is not entitled to habeas relief on these claims.

"[I]t is settled that capital punishment is constitutional," *Glossip*, *supra*, --- U.S. at ---, 135 S. Ct. at 2732, and the Sixth Circuit has repeatedly upheld Ohio's death penalty regime against constitutional challenges, including those that Mammone makes here. *Buell v. Mitchell*, 274 F.3d 337, 367–68 (6th Cir. 2001) (rejecting claims of arbitrary and unequal punishment and unreliable sentencing procedures); *Beuke v. Houk*, 537 F.3d 618, 652–53 (6th Cir. 2008) (rejecting claim that O.R.C. § 2929.04(A) does not narrow class of death-eligible offenders); *Cooey v. Coyle*, 289 F.3d 882, 927–28 (6th Cir. 2002) (rejecting vagueness challenge to statute's weighing process).

The Supreme Court itself, moreover, has rejected Mammone's argument that the jury must have the option to decline to impose a death sentence, even if it finds that the aggravating factors outweigh the mitigating factors. *Boyde v. California*, 494 U.S. 370, 377 (1990).

For these reasons, habeas relief is not available for Mammone's thirteenth and seventeenth claims.

### L. Ineffective Assistance of Appellate Counsel

In his sixteenth ground for relief, Mammone claims that direct-appeal counsel was ineffective for not arguing that: 1) trial counsel were ineffective for (a) presenting Mammone's mitigation case under the wrong statutory mitigating factor; (b) not making and/or renewing motions and objections to preserve Mammone's appellate rights; and (c) not conducting an adequate voir dire of Juror 430; and 2) the prosecution (a) withheld evidence that Mammone's blood and urine samples tested positive for benzodiazepines and (b) presented false testimony at

the pretrial suppression hearing that Mammone's blood and urine tested negative for drugs. (Doc. 23, PageID 11246–50).

Mammone presented these claims in his motion to reopen his direct appeal, but the Ohio Supreme Court denied them without a reasoned opinion. (Doc. 10–21, PageID 2036).

"When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington*, *supra*, 562 U.S. at 99. "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 99–100.

Because Mammone has not argued that the presumption is inapplicable here, I presume that the Ohio Supreme Court's unexplained order was an adjudication on the merits. *Accord Wells v. Potter*, 2018 WL 1614273, *2 (6th Cir. 2018); *Leonard v. Warden, Ohio State Penitentiary*, 2013 WL 831727, *42 (S.D. Ohio 2013).

### 1. Trial Counsel's Handling of the Mental-State Evidence

Dr. Smalldon testified that Mammone was under "extreme emotional distress" and suffering from "a severe mental disorder" at the time of the murders. But he also testified in no uncertain terms that Mammone was not insane and that he had the capacity to conform his conduct to the requirements of the law.

Despite this latter opinion, trial counsel urged the jury to consider Mammone's mental-health evidence as a mitigating factor under O.R.C. § 2929.04(B)(3). That provision directs the jury to consider as mitigating evidence whether the defendant, "because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of [his] conduct or to conform [his] conduct to the requirements of the law[.]"

Citing Dr. Smalldon's testimony the Ohio Supreme Court – which independently reweighed the aggravating and mitigating factors and found that the death sentence could stand – gave Mammone's mental state no weight under § 2929.04(B)(3). *Mammone*, *supra*, 139 Ohio St. 3d at 516. But the court nevertheless gave "moderate weight" to Smalldon's "extensive testimony about Mammone's severe personality and his mental state" under § 2929.04(B)(7), the so-called "catchall mitigation provision." *Id.* at 517.

The state supreme court's decision shows that counsel erred in arguing that the jury should consider Mammone's mental state under § 2929.04(B)(3): Dr. Smalldon's testimony denied the jury a factual basis for doing so. But was the error "sufficiently egregious" that counsel's overall representation of Mammone fell below an objective standard of reasonableness, such that this issue was likely to prevail on direct appeal? *Murray v. Carrier*, 477 U.S. 478, 496 (1986). I doubt it, given the sturdy work that counsel put into defending a case that was, essentially, unwinnable.

But I need not definitively resolve that issue because appellate counsel's failure to raise the claim was not prejudicial, and the Ohio Supreme Court was not unreasonable in so concluding.

The aggravating circumstances, involving the murder of two small children and the course-of-conduct evidence discussed above, were overwhelming. Mammone's mitigation evidence, by contrast, was hardly compelling. Furthermore, the trial court instructed the jury about the catchall aggravator, and thus, trial counsel's error notwithstanding, the jury could give whatever weight to Mammone's mental state it deemed appropriate. (Doc. 11–6, PageID 6172 – 73).

There was thus no reasonable probability that, had appellate counsel raised this claim on direct appeal, the result of the direct appeal would have been different. The Ohio Supreme Court's decision so holding was reasonable, thereby foreclosing habeas relief under § 2254(d).

## 2. Voir Dire of Juror 430 and Prosecutorial Misconduct

It is "a bedrock principle of appellate practice in Ohio . . . that an appeals court is limited to the record of the proceedings at trial[.]" *McGuire*, *supra*, 738 F.3d at 751 (internal quotation marks omitted).

Mammone's claims of ineffective assistance based on counsel's voir dire of Juror 430 and prosecutorial misconduct, in contrast, depend on evidence that was not part of the direct-appeal record: Juror 430's statements to the public defender's investigator and Spencer's undisclosed lab notes. "That being so, appellate counsel cannot be said to have been ineffective for failing to raise on direct appeal . . . a claim that relied on evidence outside the trial record." *Cowans v. Bagley*, 624 F. Supp. 2d 709, 783 (S.D. Ohio 2008).[7]

"Appellate counsel could not have brought th[ese] claim[s] on direct appeal and did not perform deficiently by complying with Ohio law." *Hill v. Mitchell*, 842 F.3d 910, 946–47 (6th Cir. 2016). The Ohio Supreme Court's decision to that effect was not unreasonable.

## 3. Failure to Renew Objections

This appellate-counsel claim fails because the objections that trial counsel failed to renew – the motion for a change of venue at the close of voir dire and to remove jurors 418 and 448 from the venire – were themselves meritless. It was not objectively unreasonable for the Ohio Supreme Court to reject this claim.

---

[7] To the extent that the claim depends on Juror 430's testimony during voir dire, the claim still fails because the record does not establish that Juror 430 was biased in favor of capital punishment.

## M. Cumulative Error

Finally, in his eighteenth ground for relief, Mammone alleges that the cumulative effect of the errors that occurred at trial and sentencing entitle him to a new trial. (Doc. 23, PageID 11269–72). Mammone raised this claim on postconviction review, and the Ohio Court of Appeals rejected it, "find[ing] no cumulative error." *Mammone II*, *supra*, 2012 WL 3200685 at *6.

Because "[t]he Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulatived in order to support relief," *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002), habeas relief is unavailable under § 2254(d). *Harrington*, *supra*, 562 U.S. at 101; *Musladin*, *supra*, 549 U.S. at 77.

## N. Motion for Discovery

I previously denied Mammone's first motion for discovery (Doc. 35) without prejudice to my reviewing the motion after deciding whether the state courts had adjudicated the claims on the merits and whether any claims were procedurally barred. (Doc. 40). By this order I have rejected all of Mammone's claims, some in light of § 2254(d), others because of procedural default, and still others under de novo review. There is, accordingly, no basis for discovery. I will therefore convert my prior order into a denial of the discovery motion with prejudice.

## O. Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that a court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."

A certificate may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

If the district court "has rejected the constitutional claims on the merits . . . [t]he petitioner must show that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). If the court denies the claim in whole or in part on procedural grounds, the certificate should issue only if "jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Id.*

Having reviewed Mammone's claims at length, I conclude that a certificate of appealability should issue as to four claims:

1. Whether the state trial court should have presumed that the pretrial publicity about Mammone's case prejudiced his ability to receive a fair trial in Stark County.

2. Whether the jurors violated Mammone's right to a fair trial by praying before their penalty-phase deliberations.

3. Whether trial counsel were ineffective for: (a) failing to raise a defense of not guilty by reason of insanity; (b) failing to retain a neuropsychologist to evaluate Mammone; and (c) allowing Mammone to make an unsworn statement at the penalty phase or failing to prepare him to give a more effective statement. Because the first and second of these claims are procedurally defaulted, the certificate will also encompass the debatable question whether the defaults can or should be excused under *Trevino v. Thaler*, 569 U.S. 413 (2013), or some other basis.

4. Whether appellate counsel was ineffective for not arguing that trial counsel were ineffective for urging the jury to consider Mammone's mental state as mitigation

evidence under O.R.C. § 2929.04(B)(3) where the defense's own evidence foreclosed the jury's ability to do so.

If Mammone wishes to expand the certificate of appealability, he should so move in the Court of Appeals.

## Conclusion

It is, therefore,

ORDERED THAT:

1.    The amended petition for a writ of habeas corpus (Doc. 23) be, and the same hereby is, denied.

2.    The motion for discovery (Doc. 35) be, and the same hereby is, denied with prejudice.

3.    A certificate of appealability be, and the same hereby is, issued on the following claims:

   A.    Whether the state trial court should have presumed that the pretrial publicity about Mammone's case prejudiced his ability to receive a fair trial in Stark County.

   B.    Whether the jurors violated Mammone's right to a fair trial by praying before their penalty-phase deliberations.

   C.    Whether trial counsel were ineffective for: (a) failing to raise a defense of not guilty by reason of insanity; (b) failing to retain a neuropsychologist to evaluate Mammone; and (c) allowing Mammone to make an unsworn statement at the penalty phase or failing to prepare him to give a more effective statement. Because the first and second of these claims are

procedurally defaulted, the certificate will also encompass the debatable question whether the defaults can or should be excused under *Trevino v. Thaler*, 569 U.S. 413 (2013), or some other basis.

D.     Whether appellate counsel was ineffective for not arguing that trial counsel were ineffective for urging the jury to consider Mammone's mental state as mitigation evidence under O.R.C. § 2929.04(B)(3) where the defense's own evidence foreclosed the jury's ability to do so.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge